FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 14, 2024

*Conzález, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 14, 2024

*Sarah Pendleton*
SARAH R. PENDLETON
ACTING SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>M.L.W. and I.A.W.,<br><br>Minor Children. | NO. 102486-0<br><br>EN BANC<br><br>Filed: November 14, 2024 |

GORDON McCLOUD, J.— In 2022, King County Superior Court terminated T.W.'s parental rights to her two daughters, I.A.W. and M.L.W. Prior to entry of the termination order, T.W.'s dependent son M.W. sought to intervene in the trial as a party in order to protect his constitutional interest in family integrity. The trial court denied M.W.'s request. The main question presented in this appeal is whether T.W. (the mother) has standing to assert M.W.'s (the son's) right to family integrity in her own appeal. We hold that in this case, where M.W. was represented by counsel in the trial court, raised his constitutional right to family

integrity through counsel in that court, and declined to raise it again on review, the answer to this question is no. The interest M.W. sought to protect is a weighty one, but T.W. fails to establish that she has third party standing to raise this issue on M.W.'s behalf in her own appeal.

The second issue in this case is whether the trial court erred in finding that the Department of Children, Youth, and Families (Department) offered T.W. all necessary services as required by RCW 13.34.180(1)(d). T.W., who is Black, argues that family therapy was a necessary service and that the social worker's failure to make such a referral demonstrates racial bias. Upon careful review of the record, we conclude that substantial evidence supports the trial court's finding that the Department offered all necessary services. And the record lacks support for T.W.'s argument that the social worker's decision was based on racial bias or was otherwise unreasonable.

We therefore affirm.

FACTS AND PROCEDURAL HISTORY

I.     Department files dependency petition

T.W. is the mother of son M.W. (born 2006) and daughters I.A.W. (born 2011) and M.L.W. (born 2014). 4 Sealed Clerk's Papers (CP) at 1705. T.W. was

2

involved in two dependencies prior to this case, both of which were dismissed. *Id.* In August 2018, the Department filed a dependency petition as to all three children based on the family's child protection service history and on recent reports of neglect and exposure to drug use and domestic violence. *Id.* At the shelter care hearing, the court ordered out-of-home placement. *Id.* at 1706.

In March 2019, T.W. agreed to dependency. *Id.* The court ordered T.W. to engage in services including a drug/alcohol evaluation, random urinalyses (UAs), and in-home services when the children's return home "appears imminent." *Id.* at 1707. The court also ordered T.W. to engage in a psychological evaluation with a parenting component and to follow any treatment recommended. *Id.*

T.W. did not engage in any services until July 2019. 3 Sealed Verbatim Rep. of Digitally-Recorded Proc. (VRP) at 1450-51. That month, she completed a psychological evaluation with clinical psychologist Dr. Tatyana Shepel. 2 VRP at 711. Dr. Shepel diagnosed T.W. with methamphetamine use disorder and alcohol use disorder (among other things). 1 CP at 12-13. Dr. Shepel recommended that T.W. complete a drug and alcohol evaluation and participate in intensive addiction treatment; she believed that T.W. was unlikely to benefit from other treatments and supports until she was sober. *Id.*

In November 2019, T.W. completed a drug and alcohol evaluation and a psychiatric evaluation. 4 CP at 1707. But she did not follow through with the evaluators' recommendations, which included intensive inpatient chemical dependency treatment, individual therapy, and intensive case management support. 1 CP at 13; 3 VRP at 1419-20. T.W. also failed to provide court-ordered UAs to the Department during this time. 1 VRP at 192. T.W. did, however, attend outpatient substance abuse counseling for about six to eight weeks in late 2019. 4 CP at 1707.

II.    Department files termination petition and T.W. engages with some court-ordered services

In February 2020, the Department petitioned for termination of T.W.'s parental rights to all three children. *Id.*[1] The Department acknowledged that the family was closely bonded and that the children did not want to be separated from their mother. 1 CP at 10. However, the Department alleged that T.W. had not consistently engaged in services and had failed to substantially improve her parental deficiency of drug abuse since the dependency began. 1 CP at 12.

---

[1] The parental rights of the children's fathers were terminated by default in September 2020 and are not at issue in this case. 4 CP at 1707.

T.W. contested the termination. The trial was continued numerous times over the following year and a half. During that time, T.W. was unable to consistently engage in or complete the court-ordered or recommended services. In March 2020, T.W. entered inpatient chemical dependency treatment. 2 CP at 309. She "was in total compliance with services" and "[t]he plan was for her girls to be returned to her" while she lived at the facility. 4 CP at 1709. But the reunification plan fell through in July 2020 after staff determined that T.W. violated a serious program rule, and T.W. chose to leave the facility before finishing treatment. 1 VRP at 348; 2 VRP at 827-28.

T.W.'s social worker helped her obtain housing and continue visitation with the children. 1 VRP at 351. T.W. also began chemical dependency and mental health treatment at a facility called Navos. *Id.* at 103-05. T.W. tested positive on a UA at Navos, but she consistently denied substance use to her social worker. 3 VRP at 1010.

At the November 2020 dependency review hearing, the court found T.W. was in partial compliance. Sealed Ex. 22. While T.W. had periods of engagement, she had not demonstrated consistent commitment to completing her court-ordered treatment and services. Sealed Ex. 23. The court expressed concern about T.W.'s

positive UA and her ongoing refusal to provide court-ordered weekly UAs to the Department. *Id.*

> III.  New social worker is assigned to the case and refers T.W. to new preferred providers; T.W. continues to test positive or invalid

In January 2021, the Department assigned social worker Colleen Stark-Bell to T.W.'s case. This was the third social worker assigned to T.W. since the beginning of the case, and the two never established rapport. 4 CP at 1708. Nevertheless, Stark-Bell regularly e-mailed and provided service letters and referrals for T.W., as previous social workers had done. *Id.*

In February 2021, T.W. began providing UAs to the Department for the first time. 4 VRP at 1538. In February and March, she submitted some UAs that were positive for alcohol use and some that returned a result of "invalid," which is consistent with tampering. Sealed Exs. 120, 124, 132; 3 VRP at 1264.

At an April meeting with Stark-Bell, T.W. requested new treatment providers because she felt her current providers were not culturally competent. 3 VRP at 1208. Stark-Bell therefore referred T.W. to a new substance abuse counselor and a new mental health counselor, both of whom were Black women. *Id.* at 1209-10. T.W. began seeing the new providers in April 2021. *Id.* at 1285.

Also around this time, Stark-Bell contacted I.A.W.'s therapist to ask whether a family therapy referral would be appropriate. Based on that conversation, Stark-Bell concluded that family therapy would not be appropriate until reunification was closer. 4 VRP at 1836.

In June, T.W.'s new substance use counselor, Shundra King, spoke to T.W. about her continuing positive UAs. 3 VRP at 1288. King said that T.W. "had a lot of denial around that." *Id.* at 1289. King believed T.W. had been actively using substances since they began seeing each other in April. *Id.* at 1293. T.W. denied this and maintained that she had not used drugs since summer 2020. *Id.* at 1288.

That month, the Department requested additional drug testing. 4 CP at 1709. A hair follicle sample T.W. submitted in July tested positive for multiple substances. Sealed Ex. 152. At least nine of T.W.'s oral swabs returned positive results for amphetamine, methamphetamine, and/or cannabis. Sealed Exs. 148, 150, 154, 156, 160, 164, 166, 170, 172, 176. And at least four UAs returned "invalid" results consistent with tampering. Sealed Exs. 158, 162, 168, 174; 3 VRP at 1275-76.

Despite these results, T.W. continued to deny drug use; she claimed that the Department was falsifying her results. 3 VRP at 1292-93; 4 VRP at 1545. In

August 2021, however, T.W. admitted to King that she had relapsed and that she was open to reentering inpatient treatment. 3 VRP at 1305.

### IV. Stark-Bell refers T.W. to parenting education

T.W. had difficulty setting boundaries with the children at visitation. Although she was not supposed to talk to the children about the dependency case, she would sometimes tell them that they were going to be adopted and other times tell them that they were coming home soon. *Id.* at 1010-11. Stark-Bell thought that an evidence-based parenting program would help T.W. better address these issues. 4 VRP at 1553. Stark-Bell referred T.W. to Lauren Brown, a Native parenting counselor. 2 VRP at 534. In summer 2021, T.W. participated in a parenting education program with Brown. *Id.* at 605. T.W. successfully completed the program. But Brown remained concerned about deeper communication issues. *Id.* at 570. Brown was especially concerned about T.W.'s inability to accept responsibility for how her actions delayed reunification and how her behavior affected the children. *Id.* at 550-51. Brown observed that "there was some underlying animosity and distrust" on the part of the children because of the confusing messages they were receiving from T.W. *Id.* at 550.

Based on these concerns, Brown recommended "a therapeutic intervention like family counseling or something where they could just get it out" and discuss these issues without a visitation supervisor monitoring them. *Id.* at 551. Brown was also concerned with T.W.'s denial of drug use despite positive drug tests. *Id.* at 545-46. Thus, she thought that family therapist should also address "the issues surrounding substance use or not and how that was impacting the family." *Id.* at 607-08. Brown also recommended that T.W. continue substance abuse treatment "and that she go to a more intensive treatment program" if necessary to maintain sobriety. *Id.* at 570.

Brown and Stark-Bell discussed the family therapy recommendation. 4 VRP at 1837. Brown did not specify when she believed family therapy should occur. *Id.* at 1636. But Brown did tell Stark-Bell that the "least . . . intrusive" way of providing family therapy would be to have one of the girls' therapists facilitate the sessions. 2 VRP at 616. Brown thought it was especially important for M.L.W.'s therapist to determine whether M.L.W. was old enough to participate in family therapy in order "to not do harm." *Id.* at 617.

The girls were not in therapy at that time, so Stark-Bell relied on the opinion of I.A.W.'s prior therapist that family therapy was not appropriate until

reunification was closer. 4 VRP at 1836-37. Stark-Bell believed that family therapy would be "essential" if the family "moved closer to reunification," but the family was "not anywhere near reunification" in summer 2021. *Id.* at 1838, 1553. Thus, Stark-Bell decided against providing a family therapy referral at that time. *Id.* at 1836-37.

V.   Department dismisses M.W.'s termination petition and moves "to exclude" his participation; M.W. requests to intervene

After many continuances, the termination trial was set for October 20, 2021. Prior to trial, the Department dismissed the termination petition as to M.W., the oldest child, since he was over 14 and objected to adoption. *See* RCW 26.33.160(1)(a).

M.W. was represented by counsel. 3 CP at 1314. In a motion in support of T.W.'s request for another continuance, M.W. expressed that although his termination petition had been dismissed, he wanted to participate in his sisters' termination trial. *Id.* at 1315. He asserted that he had "a stake in the proceedings regarding his sisters because his sibling and familial relationship with them would be jeopardized by the termination." *Id.*

On October 18, the Department and the assigned guardian ad litem (GAL) jointly filed a "Motion in Limine to Exclude Participation by Youth." 3 CP at 1304. Despite the name, the motion did not seek to exclude M.W. entirely from participating in the trial and did not seek to bar M.W. from testifying or submitting a declaration. *Id*. Instead, the motion argued that the trial court should bar M.W. from intervening as a party because he lacked standing and because he could address any concerns about his sibling relationships in his own dependency proceedings. *Id.* at 1304-05. M.W. opposed the motion, urging that his "significant interest in maintaining his relationship with his sisters" supported intervention under CR 24. *Id.* at 1488. Following a hearing, the court granted the motion to "exclude" M.W. and denied M.W.'s request to intervene. 4 CP at 1515.

VI.    Court terminates T.W.'s parental rights to M.L.W. and I.A.W.

The trial began on October 21, 2021. A few days later, T.W. requested a recess so she could enter inpatient drug treatment. The court found that the timing of this decision was "concerning and consistent with intentional delay," but it recessed the trial to allow T.W. to complete the program anyway. 1 VRP at 238.

T.W. successfully completed that one-month inpatient treatment program. Although her inpatient team recommended she return to intensive outpatient

services with King and therapy with Wilson after discharge, T.W. failed to do so. 4 CP at 1710. T.W. also failed to provide UAs to the Department after discharge. *Id.*

The trial resumed in late November. The court heard testimony from 17 witnesses. *Id.* at 1703. M.W. was scheduled to testify for T.W., but he did not appear at the scheduled time and he was not rescheduled. 4 VRP at 1793.

In addition to the testimony summarized above, T.W. testified about the difficulties of being a low-income African American mother and the racism she experienced in Seattle. 1 VRP at 317. She testified that she had not been using drugs until the children were taken away from her in August 2018. *Id.* at 338. She denied that the children had ever been exposed to drug or alcohol use in the home. *Id.* at 317. She maintained that she had been sober between July 2020 and March 2021, despite positive drug tests during that period. *Id.* at 270.

The GAL testified that the girls deeply loved their mother and had frequently expressed a desire to reunite but that the lack of permanency was very distressing and harmful to them. 2 VRP at 965-74, 997.

The trial court found all the witnesses credible, except for the portions of T.W.'s testimony regarding her own drug use. 4 CP at 1703, 1710. The court found that T.W. and the girls had an "undeniable loving bond." *Id.* at 1711. But it also

found that that bond did not outweigh the children's need for permanence and that

T.W.'s ongoing problems with substance abuse and with inability to maintain

sobriety in the community made it unlikely that she would become fit to parent in

the near future. *Id*. The court placed heavy emphasis on T.W.'s consistent denial of

her own drug use, even with her positive UAs. *Id*. The trial court also found that

family therapy was not yet a necessary service because reunification was not

imminent. *Id.* at 1708. On February 18, 2022, the trial court terminated T.W.'s

parental rights to M.L.W. and I.A.W. The Court of Appeals affirmed. *In re

Dependency of M.L.W.*, 28 Wn. App. 2d 252, 535 P.3d 491 (2023).

We granted T.W.'s motion for discretionary review. *In re Dependency of

M.L.W.*, 2 Wn.3d 1027 (2024).  We also affirm.

ANALYSIS

I.      On this record, T.W. lacks standing to appeal the trial court's order
barring M.W. from intervening

T.W. argues that M.W. was entitled to intervene in his siblings' termination

trial under CR 24 to protect his due process right to family integrity. Mot. for

Discr. Rev. at 15. In the alternative, she argues that the right to family integrity

confers a freestanding due process right on a child to intervene in a sibling's

13

termination trial regardless of what the court rules say. The Court of Appeals rejected these arguments and concluded that even if M.W. had a right to intervene in the trial court, and even if that right were violated, T.W. lacked standing to assert that claim on M.W.'s behalf on appeal.

The interest that M.W. sought to protect by intervention—the due process right to family integrity—is certainly a weighty one. And in some circumstances, it may support a right to intervene, at least permissively, under CR 24. But for T.W. to raise that interest on M.W.'s behalf on appeal, T.W. must establish that she has the right to raise M.W.'s constitutional right for him—in other words, that she has third party standing. T.W. fails to establish this.

      a.  A parent who seeks to raise a child's constitutional right to family integrity, for a child who is not the subject of the termination proceeding, must satisfy the usual prerequisites to third party standing

"Standing generally refers to a particular party's right to bring a legal claim." *Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 711, 445 P.3d 533 (2019). In general, "[t]he doctrine of standing prohibits a litigant from raising another's legal rights." *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987) (citing *Allen v. Wright*, 468 U.S. 737, 750-51, 104 S. Ct. 3315, 82 L. Ed. 2d 556

(1984)). But a litigant can raise a third party's rights in some circumstances. To establish such "third party standing," we apply the United States Supreme Court's test from *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). Under that test, a litigant seeking to raise a third party's rights must show that (1) the litigant has suffered an "injury in fact," thus giving them a "'sufficiently concrete interest' in the outcome of the issue in dispute," (2) the litigant has a close relation to the third party, and (3) something hinders the third party's ability to protect their own interests. *Id.* at 411 (citing *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S. Ct. 2868, 49 L. Ed 2d 826 (1976)). Washington courts have applied the *Powers* test in a variety of contexts, including the parental rights termination context. *In re Dependency of A.N.C.*, 24 Wn. App. 2d 408, 426, 520 P.3d 500 (2022), *review denied*, 1 Wn.3d 1012 (2023).

T.W. argues that a parent appealing a termination order has automatic standing to "raise a violation of her dependent child's due process rights on appeal" without establishing these usual prerequisites to third party standing. Reply Br. at 2. She relies on decisions in which we did indeed address the merits of a parent's argument that their child's due process rights were violated without applying the *Powers* test. In *In re Dependency of M.S.R.*, 174 Wn.2d 1, 271 P.3d

234 (2012), a parent claimed on appeal that her children's due process rights were violated because the trial court had not appointed the children counsel. We reached the merits of the argument without even discussing the parent's standing. *Id.* at 11; *see also In re Dependency of E.H.*, 191 Wn.2d 872, 427 P.3d 587 (2018).[2]

But as the Department argues, those cases were different. First, in *M.S.R.* and *E.H.*, the parent sought to raise a claim on behalf of a child who was the *subject* of the termination proceedings. Here, M.W. was not the subject of the termination at the time he sought to intervene. Second, in *M.S.R.* and *E.H.*, the children lacked representation by counsel—indeed, the right the parent sought to assert on the children's behalf was their right to counsel itself. In contrast, in this case, M.W. had counsel, moved to intervene through counsel in the trial court, and could have challenged the trial court's denial of his request to intervene himself by seeking review. Suppl. Br. of Resp't Dep't at 13.

---

[2] T.W. also argues that *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 487 P.3d 960 (2021), and *In re Dependency of A.E.T.H.*, 9 Wn. App. 2d 502, 446 P.3d 667 (2019), support her argument, but they do not. In *J.D.P.*, the parent argued that the court violated her *own* right to present a defense when it denied her children's motion to intervene. In *A.E.T.H.*, the court declined to reach the due process claim that parents brought on behalf of their child.

The Department's argument also finds support in *A.N.C.*, 24 Wn. App. 2d 408. In that case, the parent whose rights had been terminated sought to raise her children's purported due process right to open adoption on appeal. *Id.* at 426. The Court of Appeals applied the typical *Powers* third party standing test. *Id.* It rejected the mother's argument that *M.S.R.* conferred automatic standing, noting that *M.S.R.* did not directly address how that parent had standing to raise a due process claim on behalf of her children on appeal. *Id.* And it concluded that "insofar as *M.S.R.* made a tacit assumption of third-party standing . . . , the case was notably different from this one because the children in *M.S.R.* had not been represented at the trial court. The children here were, and this element is dispositive." *Id.* (citation omitted) (citing *M.S.R.*, 174 Wn.2d at 11).

Applying the *Powers* test to third party standing claims is the rule, not the exception, in Washington. We hold that in a termination appeal, a parent must establish third party standing to raise a due process claim on behalf of a child who is represented by counsel and who is not the subject of the termination action.

b.  T.W. lacks third party standing to appeal the denial of M.W.'s request to intervene because nothing hindered M.W.'s ability to protect his own interests

Here, T.W. meets the first two prerequisites to third party standing. T.W. has established that she suffered an injury in fact—her parental rights to her daughters were terminated.[3] And it is uncontested that T.W. has a close relationship with her son M.W. Thus, under the *Powers* test, the primary issue in this case is whether T.W. has established the third requirement, that something hinders M.W.'s ability to protect his own interests. We hold that T.W. does not meet this requirement.

Determining the existence of a hindrance requires examining "the likelihood and ability of the third parties . . . to assert their own rights." *Powers*, 499 U.S. at 414 (citing *Singleton*, 428 U.S. at 115-16). The analysis turns on whether "some

---

[3] The Department argues that the injury prerequisite requires T.W. to show an injury arising specifically from the denial of M.W.'s motion to intervene. It argues she suffered no injury from that denial because it did not affect her ability to defend against termination. Suppl. Br. of Resp't Dep't at 13. But the Department cites no authority for this narrow reading of the injury requirement. And in *A.N.C.*, the Court of Appeals held the opposite: where a mother sought third party standing to assert her children's due process right on appeal, she established injury in fact based on the fact that her parental rights had been terminated. 24 Wn. App. 2d at 426. The court did not require the mother to show an injury arising specifically from the alleged violation of her children's due process rights. We agree with the *A.N.C.* court's approach.

genuine obstacle" bars the third party's assertion of their own rights. *Singleton*, 428 U.S. at 116. A third party's representation by legal counsel strongly suggests that they have the ability to assert their own rights. Indeed, as discussed above, the *A.N.C.* court found this factor "dispositive" in holding that a parent lacked third party standing to raise her represented children's rights on appeal. 24 Wn. App. 2d at 426-27; *see also In re Guardianship of Decker*, 188 Wn. App. 429, 353 P.3d 669 (2015) (litigant did not establish hindrance to incapacitated person's ability to represent her own interests, where incapacitated person had appointed guardian and litigant did not allege guardian was inadequate to protect person's interests); *In re Guardianship of Cobb*, 172 Wn. App. 393, 292 P.3d 772 (2012) (same). And logically, no hindrance exists if "'the third party actually asserts his own rights.'" *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 403 (6th Cir. 2017) (quoting *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008)). Here, not only was M.W. represented, but he actually did assert his own rights when he sought to intervene.

T.W. mainly argues that M.W. was hindered because he had no right to appeal the trial court's denial of intervention. But no procedural barrier barred M.W. from seeking review of the trial court's adverse ruling. The parties have not

really addressed whether this matter is appealable as of right under RAP

2.2(a)(13). But even if it were not, RAP 2.3(a) permits a party to seek

discretionary review of "any act of the superior court not appealable as a matter of

right." That includes a superior court's order denying intervention. *In re*

*Dependency of C.R.O'F.*, 19 Wn. App. 2d 1, 9, 493 P.3d 1235 (2021)).

Given that (1) M.W. had counsel and (2) he could have sought review of the

trial court's order denying his intervention request but did not, we conclude that

T.W. has not established that M.W. was hindered in protecting his own interests.

We therefore hold that T.W. lacks standing to appeal the denial of M.W.'s request

to intervene.[4]

Our decision rests solely on T.W.'s lack of standing. It does not disturb any

decisions of this court or the appellate courts holding that the due process clause

---

[4] The Department argues for the first time in its supplemental brief that T.W. is not an aggrieved party under RAP 3.1 with respect to the intervention issue. Suppl. Br. Resp't Dep't at 12. We typically do not consider arguments raised for the first time in a supplemental brief. *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 826, 854 P.2d 1072 (1993). We note, however, that the trial court ordered termination of T.W.'s parental rights. T.W. is clearly aggrieved by this order. The Department has not identified any decisions holding that a party must establish that they are "aggrieved" by each of the issues upon which a trial court's order is based.

protects the right to family integrity.[5] It does not disturb our prior decisions recognizing that sibling relationships are encompassed within that right to family integrity. In *M.S.R.*, we plainly held that children's "fundamental liberty interests" include "maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships." 174 Wn.2d at 20.

We therefore disagree with a portion of the Court of Appeals analysis in this case. The Court of Appeals relied on its prior decision in *J.D.P.* for the rule that children "have no legal interest [in sibling relationships] beyond what is found in dependency statutes for limited contact facilitation by the Department." *M.L.W.*, 28 Wn. App. 2d at 266 (citing *J.D.P.*, 17 Wn. App. 2d at 762). That conclusion conflicts with *M.S.R.* We therefore reemphasize the holding of *M.S.R.*, that is, that

---

[5] *E.g.*, *In re Welfare of L.R.*, 180 Wn. App. 717, 723, 324 P.3d 737 (2014) ("Preservation of the family unit is a fundamental constitutional right protected by the Fourteenth Amendment to the United States Constitution." (citing *In re Interest of Darrow*, 32 Wn. App. 803, 806, 649 P.2d 858 (1982) (citing *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)))); *see also Moore v. City of East Cleveland*, 431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion) (recognizing fundamental right to keep the family together); *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion) (children and parents "share a vital interest in preventing erroneous termination of their natural relationship," and courts must provide adequate process to protect that interest).

the constitutional right to family integrity protects a child's interest in sibling relationships.

      II.      The Department offered all necessary services capable of correcting T.W.'s parental deficiencies within the foreseeable future

To terminate a parent's rights, the Department must establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. The issue in this case is whether the trial court erred in finding that the Department proved one of those elements, that is, that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d).

The trial court found that family therapy was not a necessary service because "this service would not have remedied mother's identified primary deficiencies, specifically the substance abuse that led to the neglect of the girls." 4 CP at 1708. Further, even if the service would have helped T.W. remedy her substance abuse, the court found that it would not address those deficiencies within the foreseeable future for the children. *Id.* at 1708-09.

T.W. argues that family therapy was a necessary service because it "was intended to help T.W. address her substance abuse and would have assisted in reunification, regardless of how 'imminent' it was." Suppl. Br. of Pet'r at 44-45. T.W. asserts that Stark-Bell's decision against providing a referral to family therapy was made unilaterally and in disregard of Brown's recommendation and that it demonstrates racial bias. Mot. for Discr. Rev. at 25.

The Department disagrees with T.W. on these points. It argues that the trial court properly determined that family therapy was not a necessary service because it was not primarily intended to address T.W.'s substance abuse. It also rejects T.W.'s assertion that Stark-Bell's decision demonstrates racial bias. Dep't Resp. to Mot. for Discr. Rev. at 24. The Department further argues that the trial court carefully considered all the witness testimony and "properly examined the nuances of the family therapy recommendation in adjudicating the termination petition." *Id.* at 25.

On review of a termination order, we must assess whether substantial evidence supports the trial court's findings. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Those findings "'will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record.'" *Id.* (quoting

23

*In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)). We defer

to the trial court's determinations of witness credibility and the persuasiveness of

the evidence. *Id.* (citing *K.R.*, 128 Wn.2d at 144). "We review de novo whether the

court's findings of fact support its conclusions of law." *Id.* (citing *In re*

*Dependency of Schermer*, 161 Wn.2d 927, 940, 169 P.3d 452 (2007)).

Applying this standard, we hold that substantial evidence supports the trial

court's finding that family therapy was not a necessary service because it could not

correct T.W.'s primary parental deficiency, substance abuse, within the foreseeable

future. And as discussed further below, we hold that this record does not support

T.W.'s argument that Stark-Bell's decision to defer family therapy demonstrates

racial bias.

a. Substantial evidence supports the finding that family therapy was not
a necessary service

A "necessary service" is a service "'needed to address a condition that

precludes reunification of the parent and child'" and may include counseling,

mental health treatment, and educational programs. *In re Parental Rights to D.H.*,

195 Wn.2d 710, 719, 464 P.3d 215 (2020) (internal quotation marks omitted)

(quoting *K.M.M.*, 186 Wn.2d at 480). Even if a parent claims that the Department

failed to offer a service, "termination is appropriate if the service would not have

remedied the parental deficiency in the foreseeable future." *Id.* (citing RCW

13.34.180(1)(d)). "'Foreseeable future' is determined from the point of view of the

child." *K.M.M.*, 186 Wn.2d at 486 (internal quotation marks omitted) (quoting *In*

*re Welfare of Hall*, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983)).

T.W. argues that family therapy would have helped her address her

substance abuse, which was her primary identified parental deficiency. Brown

recommended the service in part because she believed it could help T.W.

understand "the issues surrounding substance use or not and how that was

impacting the family." 2 VRP at 608. It is certainly possible that family therapy

might be a step in a parent's recovery process, especially where, as here, the family

was closely bonded.

But even if the service could have addressed T.W.'s substance abuse, it is

not a "necessary service" unless it is capable of remedying the parental deficiency

*within the foreseeable future*. RCW 13.34.180(1)(d). Substantial evidence supports

the trial court's conclusion that family therapy would not have done so. Over the

course of this four-year dependency, T.W. was unable to maintain sobriety. She

denied substance use even when confronted with positive tests and she engaged in

services to address her substance use disorder only inconsistently. T.W.'s own

25

expert opined that reunification would be "contingent on sustaining recovery" and should occur "if and only if she does not return to reliance on substances." Ex. 301 at 41.

The GAL and Stark-Bell each testified that based on the children's youth, their understanding of the foreseeable future was no more than a few months. 3 VRP at 1401; 4 VRP at 1595. Stark-Bell opined that even if T.W. dedicated herself to addressing her substance use, it would still take at least a year to achieve enough progress for reunification. 4 VRP at 1579, 1595, 1871. Shundra King, T.W.'s preferred outpatient substance use treatment provider, testified that in her experience it was not necessary for a parent to completely finish outpatient treatment before reunification. 3 VRP at 1319-20. However, T.W. had stopped engaging in outpatient treatment after discharge from inpatient treatment in November 2021. *Id.* at 1300. King opined that even if T.W. started intensive outpatient treatment immediately, it would take her at least one year to complete it. *Id.* at 1317-19. And in a case like this, where a person left inpatient and did not follow up with outpatient, King would be concerned about the person's ability to maintain long-term recovery. *Id.* at 1303. Joshua Sweet, T.W.'s inpatient substance

use counselor, agreed that T.W. likely needed a year to complete intensive outpatient treatment. 2 VRP at 648.

Our recent decision in *D.H.* is instructive. There, a mother in a dependency case was unable to begin a recommended therapy service for over a year. *D.H.*, 195 Wn.2d at 720. A month after the mother was able to begin the service, the court terminated her parental rights. *Id.* The mother argued that the termination was premature because she was not given the opportunity to complete the service. *Id.*

We found the mother's argument "compelling" but concluded that the statutory language of RCW 13.34.180(1)(d) and substantial evidence supported the trial court's finding that the service would not have remedied her parental deficiencies in the foreseeable future. *Id.* at 721-22. The Department had provided the mother with many services intended to address her parental deficiencies throughout the seven-year dependency, but the mother made "minimal progress." *Id.* at 722. We held that in light of the mother's "inability to resolve her parental deficiencies through the numerous services provided," substantial evidence supported the trial court's finding that even with the incomplete therapy treatment,

the mother was currently unable to "attend to her children's emotional or physical needs and her abilities were unlikely to change in the near future." *Id.* at 724.

We contrasted this with *In re Parental Rights of B.P.*, 186 Wn.2d 292, 376 P.3d 350 (2016), where we reversed a termination order and reasoned that because "the mother successfully remedied her underlying deficiencies and the remaining deficiency was the child's detachment, the State could not terminate parental rights on that basis without first providing attachment services." *D.H.*, 195 Wn.2d at 722 (citing *B.P.*, 186 Wn.2d at 317-18). Because of the *B.P.* mother's "prior success," we concluded that "she also had a reasonable probability of resolving the attachment deficiency with attachment services." *Id.* Thus, in *B.P.*, the Department had not offered "all necessary services capable of correcting the parental deficiencies within the foreseeable future." *Id.*

Sadly, this case is more similar to *D.H.* than to *B.P.* As in *D.H.*, in light of T.W.'s "inability to resolve her parental deficiencies through the numerous services provided" over the course of four years, it is highly probable that family therapy could not have resolved that deficiency within the children's foreseeable future, which was a few months. *Id.* at 724. Therefore, we conclude that substantial

evidence supports the trial court's finding that the Department established the

necessary services requirement of RCW 13.34.180(1)(d).

      b.  T.W.'s argument that the social worker's decision to defer family therapy was racially biased is not supported by this record

The trial court found that the Department's decision to defer family therapy

until reunification was imminent was "reasonable." 4 VRP at 1955. That court also

found that it was reasonable to defer family therapy until "cross collaboration . . .

with the girls' own therapists" could be arranged. *Id.* The Department agrees.

T.W. counters that the social worker's decision to defer family therapy was

not reasonable because it was made unilaterally, it disregarded Brown's

recommendation, and it reflected a racially biased viewpoint that Black family

bonds are less worthy of protection. Mot. for Discr. Review at 25.

This is a challenging issue, not the least because it was raised for the first

time on appeal. That means that we lack a factually developed record on this point

and we lack specific trial court findings about racial bias to review.  T.W.'s

argument that systemic racial bias exists within the child welfare system is

compelling and well supported. But we must consider the specific record in front

of us to determine whether the trial court's findings of fact and conclusions of law

are legally supported in this particular case.[6] Applying that standard, we hold that substantial evidence in this record supports the court's conclusions that Stark-Bell's decision to defer family therapy was reasonable and that the Department offered all necessary services as required by RCW 13.34.180(1). This record does not support the conclusion that the decision demonstrates racial bias.

As stated, the Department offered T.W. many services to address her substance use and mental health issues, including referrals to T.W.'s preferred providers. But T.W. engaged with these services only inconsistently. Stark-Bell's decision to defer family therapy until reunification was closer was not made "unilaterally" but, instead, after gathering information and discussing the issue with providers. Brown, the parenting education provider, emphasized that having one of the girls' therapists facilitate the sessions would minimize stress to the children. Brown particularly urged Stark-Bell to consult with M.L.W.'s therapist for advice on whether the therapy would be harmful to the young girl. But Brown did not specify when she thought family therapy should occur.

---

[6] T.W. does not propose an alternate framework under which we should analyze a claim that racial bias affected a social worker's decision or a court's termination order.

In summer 2021, the girls were not currently in therapy. But Stark-Bell had spoken with I.A.W.'s former therapist in March and, based on that discussion, had concluded family therapy would not be appropriate until reunification was imminent. Given Brown's suggestion, the fact that the girls were not currently in therapy, and Stark-Bell's conversation with I.A.W.'s former therapist, it was reasonable for Stark-Bell to defer family therapy until reunification was closer. We hold that substantial evidence supports the finding that Stark-Bell's decision was reasonable.

CONCLUSION

The constitutional right to family integrity encompasses a child's interest in maintaining the integrity of sibling relationships. *M.S.R.*, 174 Wn.2d at 20. In some cases, that right could support a child's request to intervene in a sibling's termination case. But in this case, nothing hindered M.W.'s ability to assert this interest on his own behalf on review (just as he had done, through counsel, in the trial court). We therefore hold that T.W. fails to establish third party standing to raise this claim on M.W.'s behalf.

We also hold that substantial evidence supports the trial court's finding that the Department offered all necessary services as required by RCW

31

13.34.180(1)(d). On this record, the Department's decision to defer family therapy was reasonable and did not demonstrate racial bias.

We therefore affirm the decision of the Court of Appeals.

_____
Gordon McCloud, J.

WE CONCUR:

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
Yu, J.

_____
Whitener, J.

32

No. 102486-0

MONTOYA-LEWIS, J. (concurring and dissenting)—As we have held in other cases, families of color are disproportionately impacted by the child welfare system. *In re Dependency of K.W.*, 199 Wn.2d 131, 158, 504 P.3d 207 (2022). The shameful history of the child welfare system continues to negatively impact families of color, and we should consider that fact when we have cases involving these families, particularly when parents and/or dependent children raise objections to the services provided to them prior to the termination of parental rights.[1]   In this case, the mother has raised objections to the trial court's conclusion that family therapy was not a necessary service and that the failure of the Department of Children, Youth, and Families (Department) to provide it demonstrated racial bias.  Based on this record and the claims raised by the mother, T.W., I would likely remand the case for further hearings on this issue.  However, given the length of time that these children have

_____

[1] The data shows that children of color are impacted disproportionately to white children at every decision point in the child dependency process in Washington State.  MARNA MILLER, WASH. STATE INST. FOR PUB. POL'Y, RACIAL DISPROPORTIONALITY IN WASHINGTON STATE'S CHILD WELFARE SYSTEM 7-8 (2008), https://www.wsipp.wa.gov/ReportFile/1018/wsipp_Racial-Disproportionality-in-Washington-States-Child-Welfare-System_Full-Report.pdf [https://perma.cc/FV7M-D29Y]; WASH. STATE CTR. FOR CT. RSCH., DEPENDENT CHILDREN IN WASHINGTON STATE: CASE TIMELINES AND OUTCOMES 2020 REPORT App. B (2021), https://www.courts.wa.gov/subsite/wsccr/docs/2020DTR.pdf [https://perma.cc/PZ6Z-52ZP].

1

waited for permanency, I write to concur separately as my analysis diverges from the majority. Respectfully, I concur in the result but dissent as to the analysis on this issue.

The length of time this case has been in our system and the importance of permanence to these dependent children matters because, for any child, knowing where they will live and with whom matters, and they need to know that their living situation remains stable and free from the risk of harm. Thus, I would not reverse the termination of parental rights in this case. But I think it is a very close call and have weighed the risk of jeopardizing that permanence against the impact of racial bias on this family. I would conclude that the recommended services were appropriate, culturally relevant, and necessary, and that the Department failed to provide such services. Given the issues regarding the necessity of permanence to these children, I conclude reluctantly that reversal would be harmful in this case, though I would have preferred that the case be remanded for a hearing on the issue of racial bias, at a minimum.

As we unanimously stated in *K.W.*, "[r]elational permanence is particularly critical for Black, Indigenous, and other children of Color, who are disproportionately affected by the trauma of child welfare and other legal systems." 199 Wn.2d at 155. Understanding how to ensure that these systems help and support families in crisis takes time and is not simple. The trial courts rely on the Department

to assess and determine what services are necessary to support family reunification. The record in this case troubles me on this point.

The majority states that "substantial evidence supports the trial court's finding that family therapy was not a necessary service because it could not correct T.W.'s primary parental deficiency, substance abuse, within the foreseeable future." Majority at 22. I would not so conclude based on such a limited record. The majority states that T.W.'s ongoing substance abuse presented a barrier to her engagement in family therapy and could not be remedied in the foreseeable future. That may be the case, but that analysis elides what I view as the critical point: Brown, the Native American provider hired for her ability to provide culturally relevant and informed services recommended family therapy and the social worker determined that it was not the appropriate time to provide those services. 2 Sealed Verbatim Rep. of Digitally-Recorded Proc. (VRP) at 535-36, 538, 551; 4 VRP at 1836-37.

It is here where I depart from the majority's analysis and would find that at a minimum, we do not have enough information to decide that racial bias *did not* impact the social worker's decision not to move forward with this recommendation.[2] *See, e.g.*, *Henderson v. Thompson*, 200 Wn.2d 417, 435, 518 P.3d 1011 (2022) (placing the burden on the party benefiting from alleged racial bias to prove it did

---

[2] The majority even acknowledges that "we lack a factually developed record on this point [of racial bias] and we lack specific trial court findings about racial bias to review." Majority at 27.

*not* affect the result at trial (citing *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011))). My read of the record leads me to different conclusions than the majority's. As we said in *K.W.*, "We know that like all human beings, judges and social workers hold biases, and we know that families of Color are disproportionately impacted by child welfare proceedings. Therefore, actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making." 199 Wn.2d at 156. In order to be vigilant, we should also be humble. Humility helps us to recognize that we may not always have all the information to accurately assess when racial bias impacts actions in a child welfare proceeding; further, when a parent, as here, raises that issue more than once during a case, we should view that record recognizing that we are unlikely to see judges, social workers, or others involved in these cases engage in blatant, obvious racism or decision-making that we can easily identify as racially driven. We would hope that decisions made with an obvious racial bias would be identified long before a case gets to a critical juncture like a termination proceeding and before it becomes an issue on an appellate record. But hope is not a panacea against bias, and we must be active in addressing in it and recognize it is not only possible but likely that our appellate records may raise questions that only a trial court might answer. Hoping that the record will always identify racism cannot be enough to satisfy our obligation

to work to ensure a system *we know* to be rife with disproportionate impacts and outcomes on communities of color.[3]

To give meaning to our case law where we have discussed what is required of our legal system in response to what we already know to be a system that has disproportionately negative impacts on communities of color, we have to listen to those communities and their members. To be sure, we cannot conclude that racial bias drives a decision based on a single claim that has no evidence to support it. Striking a careful balance remains difficult and something the appellate courts have wrestled with. *See Henderson*, 200 Wn.2d at 433 ("[R]acial bias 'can influence our decisions without our awareness,' making it uniquely pernicious because 'people will act on . . . bias far more often if reasons exist giving plausible deniability.'" (second alteration in original) (quoting *State v. Berhe*, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019); *State v. Saintcalle*, 178 Wn.2d 34, 49, 309 P.3d 326 (2013) (plurality opinion))).

---

[3] We discussed this obligation in our letter of June 4, 2020 when we stated, "The devaluation and degradation of [B]lack lives is not a recent event. It is a persistent and systemic injustice that predates this nation's founding. . . . [W]e must recognize that systemic racial injustice against [B]lack Americans is not an omnipresent specter that will inevitably persist. It is the collective product of each of our individual actions—every action, every day. It is only by carefully reflecting on our actions, taking individual responsibility for them, and constantly striving for better that we can address the shameful legacy we inherit." Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1-2 (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme% 20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https:// perma.cc/QNT4-H5P7].

But we have more than that on this record, even though this record is limited. Brown was engaged in providing recommendations and services to this family because she possessed skills necessary to assess what might support the children and T.W. as they navigated rebuilding a difficult relationship. 2 VRP at 531-35, 605. The social worker did not proceed with a family therapy referral, largely because T.W. had not made "appropriate" progress on addressing her ongoing substance abuse issues. 4 VRP at 1836-38. Brown believed that the children would benefit from family therapy because it would give them an opportunity to express the hurt, pain, and distrust they had as a result of T.W.'s struggles. 2 VRP at 551, 607-08. While I agree that T.W. needed to address her substance abuse issues and she appeared resistant to doing so, that should not have prevented a referral to family therapy. T.W. could have engaged in addressing both issues, and it is possible that one might support the other (i.e., family therapy might support her ability to engage in substance abuse treatment). Family systems therapy is used commonly in concert with substance abuse treatment; the therapist is in the best position to determine its usefulness, not the court, at least not without a discussion of this decision on the record.[4]

---

[4] I recognize that someone who is actively under the influence may not benefit from family therapy and, in this case, that the children could have been negatively impacted by T.W. if she were to be under the influence while in family therapy. But since this referral was never made, no family therapist was able to assess T.W.'s ability to safely engage in family therapy, so the record is silent on this point.

Given the statutory timelines under which the Department, families, and the courts must operate to get families in dependency to permanency (whether permanency means reunification or termination), services have to be provided in a timely way. The majority concludes that T.W. could not resolve her substance abuse issues "in the foreseeable future" and, therefore, agrees with the trial court that it was not necessary to provide family therapy. This assertion misapprehends how services can and should be provided. Services may need to be "stacked"—meaning that a parent may need to engage in multiple services at a time, rather than waiting to complete one before beginning another—so that parents have access to necessary services in a timely way. The record does not show that T.W. could not have engaged in family therapy. Rather, the record shows that the referral was never made because Stark-Bell, the social worker, determined that T.W. and the children would not benefit. (Interestingly, the majority seems to assert that the "foreseeable future" should be assessed based on the dependent children's ability to understand the future, majority at 23-24, which I cannot find support for in the dependency statutes or our precedent.)

What troubles me about the apparent dismissal of T.W.'s claim that racial bias impacted her case is the following logic necessary to do so: if there is an alternate explanation for the actions taken, then racism must not be the reason for those actions. *See Berhe*, 193 Wn.2d at 666 ("Thus, when determining whether there has

been a prima facie showing of implicit racial basis, courts cannot base their decisions on whether there are equally plausible, race-neutral explanations. There will almost always be equally plausible, race-neutral explanations because that is precisely how implicit racial bias operates."). I cannot disagree that there may be reasonable support for the conclusion that family therapy was not a necessary service. But that does not satisfy me on this record, particularly given that T.W. made repeated assertions that she experienced racism on a regular basis as a single Black mother living in Seattle. 1 VRP at 317. I am troubled that we substitute our own judgment for hers and prevent her from making such an argument on a fuller record, which is what I would consider to be the minimum required on this record.

Given the other issues in this case and the need for permanence here, I concur in the result though I would prefer to remand the case for a hearing on these particular claims made by T.W. My analysis on what the applicable law should be on this issue differs greatly from the majority, so I dissent as to the analysis.

Therefore, I respectfully concur in the result only.

Montoya-Lewis, J.

González, C.J.

8