IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to: | ) | No. 40808-6-III |
| | ) | (consolidated with |
| | ) | No. 40809-4-III) |
| M.A.P.† | ) | |
| M.M.B.-P. | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

LAWRENCE-BERREY, C.J. — Ms. P., mother to M.A.P. and M.M.B.-P. appeals the

termination of her parental rights. She argues the Department of Children, Youth, and

Families (DCYF) failed to offer necessary services capable of correcting her parental

deficiencies; specifically, that they failed to tailor the services to her developmental

disability. Substantial evidence supports the trial court's findings to the contrary. We

affirm.

---

† To protect the privacy interests of the minor children, we use their initials
throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title*
(Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.
wa.gov/appellate_trial_courts.

No. 40808-6-III (consolidated with No. 40809-4-III)
*Parental Rights to M.A.P.*; *Parental Rights to M.M.B.-P.*

FACTS

Ms. P. is the mother of three children, one of whom is not part of the current proceedings.[1] This appeal concerns the termination of Ms. P.'s parental rights to M.A.P., born March 15, 2009, and M.M.B.-P., born January 20, 2020. M.A.P's father's whereabouts are unknown. M.M.B.-P.'s legal father relinquished his parental rights and passed away during the pendency of the underlying dependency actions. M.M.B.-P.'s biological father could not be found.

Ms. P. has a history with DCYF. In 2013, a referral was made alleging neglect by Ms. P., specifically, that she was leaving M.A.P. and her middle daughter unattended. Ms. P. participated in and completed Family Preservation Services through DCYF. In November 2017, a referral was made alleging Ms. P.'s former partner sexually abused the two children. The partner admitted to sexually abusing Ms. P.'s children and they were sent to live with their maternal uncle in Oregon through a voluntary placement agreement. Even though Ms. P.'s partner admitted to sexually assaulting her children and the children spoke about it during forensic interviews, Ms. P. believed it was fabricated.

M.A.P. was returned to Ms. P.'s care in August 2019 because Ms. P. seemed to be doing well. In November 2019, DCYF received two referrals, one regarding M.A.P.

_____

[1] Ms. P.'s middle child lives with her father.

having poor hygiene and the other due to M.A.P. inappropriately touching another child and concerns that Ms. P. was not addressing her mental health issues.

*1. Dependency Petitions*

On January 22, 2020, DCYF received another referral with concerns regarding M.A.P. having inappropriately touched another child, and Ms. P.'s failure to supervise M.A.P. after being made aware of her behaviors. Due to previous interactions with Ms. P., DCYF was concerned about her continued denial of the sexual abuse M.A.P. had suffered from Ms. P.'s prior partner and a lack of understanding about the concerns surrounding M.A.P.'s sexualized behaviors. DCYF was also concerned that Ms. P.'s then-romantic partner and M.M.B.-P.'s legal father, was a registered sex offender. Ms. P. was aware of his status but felt he was still an acceptable caregiver for M.A.P.

On January 24, 2020, a second referral reported M.M.B.-P., just a few days old, outside in cold weather wearing only a onesie and a blanket. The Wenatchee Police Department investigated and found M.M.B.-P. appropriately dressed and did not have any concerns for either child's physical condition. However, law enforcement placed M.A.P. in protective custody after arresting Ms. P. for an extraditable warrant and left M.M.B.-P. in his father's care. M.M.B.-P. was placed into protective custody a couple of days later when M.M.B.-P.'s father indicated an unwillingness to care for him.

On January 27, Angela Stephens-Adamek, a Child Protective Services investigator, held a family team decision-making meeting with Ms. P. by telephone from jail and discussed concerns regarding Ms. P.'s mental health and substance use disorder issues, and M.A.P.'s lack of proper schooling and mental health services. During the meeting, Ms. P. agreed to engage in a mental health assessment through Catholic Family Services after she was released.

Ms. Stephens-Adamek filed dependency petitions for both children on January 28, 2020. The primary safety threat to the children was Ms. P.'s inability to control her behavior due to mental health and substance abuse issues. There was also concern Ms. P. was not addressing M.A.P.'s mental health and behavioral needs.

While preparing to file the petitions, Ms. Stephens-Adamek discovered a 2011 psychological evaluation done for employment purposes showing Ms. P.'s IQ at 62, putting her into extremely low, borderline mild retardation. This was shared with the family's social worker, Tony Block. The evaluation contained recommendations on how to maximize her employability, noting she would do better with simple, repetitive tasks and in settings that did not require her to interact with large numbers of coworkers or consumers.

*Mr. Block: Social Worker from January 2020 to August 2021*

When Mr. Block was assigned the case in late January 2020, M.A.P. was placed in foster care in Spokane, three hours away from Wenatchee, and M.M.B.-P. was placed locally. Mr. Block remained the family's social worker for 18 months.

At the time of placement, DCYF determined that drug and alcohol, parenting classes, safe and stable housing, a mental health evaluation, and a psychological evaluation were the services Ms. P. needed to correct her parental deficiencies. However, Mr. Block did not start recommending Ms. P. for all the services right away because it was during the early COVID-19 pandemic. He did refer her to a parenting class that she completed in March 2020 by phone. In March 2020, Ms. P. also started mental health appointments at Catholic Charities. Once Mr. Block learned that Ms. P.'s driver's license was suspended, he arranged transportation to her services and visits with her children.

2. *Dependency Orders*

On June 5, 2020, an agreed order of dependency and disposition was entered as to both children and Ms. P. The court ordered Ms. P. to participate in random urinalysis testing (UAs), a drug and alcohol evaluation, parenting education, a psychological evaluation, a mental health assessment, and to follow any recommended treatment. The court also ordered Ms. P. to find safe and stable housing, sign releases of information, and to maintain contact with DCYF.

Starting in early 2021, Ms. P. began other services. After Ms. P. was arrested for committing domestic violence against M.M.B.-P.'s father, Mr. Block referred Ms. P. for a domestic violence assessment. DCYF's awareness of the 2011 psychological evaluation motivated it to get an updated psychological evaluation aimed toward parental deficiencies. Mr. Block referred Ms. P. for a psychological evaluation with Dr. Catherine MacLennan sometime between June 2020 and January 2021.[2] In March 2021, Ms. P. started services at New Path for drug abuse treatment. Sometime after June 2021, when Dr. MacLennan was unable to complete a full evaluation on Ms. P., Mr. Block attempted to set up another evaluation with a different doctor; however, Ms. P. refused to go.

Mr. Block did not recall Ms. P. having a low IQ but believed he was able to effectively communicate with Ms. P. when she was sober and they had "really good conversations." Rep. of Proc. at 96. She understood what DCYF was asking of her, could recite the services she knew she had to do, made promises to do UAs, and to get better at showing up for visits. However, when she was not sober, she became belligerent and did not accept any accountability for the current situation. She would indicate she believed she did everything she was supposed to do but when spoken to about her

---

[2] There is some conflict between Mr. Block's and Dr. MacLennan's testimonies. Mr. Block testified referring Ms. P. to Dr. MacLennan as early as June 2020. Dr. MacLennan believed she received the referral in early 2021.

nonparticipation in some services, like the UAs and the other evaluations, she would say she should not be required to do them. Mr. Block never believed Ms. P. was unable to understand because of cognitive difficulties. She was able to repeat things back to him and asked good follow-up questions.

Mr. Block communicated with her about services in person and on the phone, sent letters, and spoke to her about why certain services were being requested. Mr. Block believed her primary parental deficiency and largest obstacle was her substance use disorder because it controlled her life.

*Ben Shuts: Mental Health Therapist at Catholic Charities*

Ben Shuts, Ms. P.'s mental health therapist at Catholic Charities, conducted her initial assessment resulting in a diagnosis of generalized anxiety disorder on March 6, 2020. During the first appointment, Ms. P. stated she had a learning disability. However, because the appointments were individual and Ms. P. appeared to understand the materials, expressed understanding, and asked appropriate follow-up questions, Mr. Shuts did not provide any accommodation.

Mr. Shuts was not given any collateral information in 2020 from DCYF regarding Ms. P.; however, he was later contacted by a social worker and told about Ms. P.'s possible intellectual disabilities. Mr. Shuts considered the report but believed Ms. P. did not need any special accommodation.

Mr. Shuts also allowed Ms. P. to attend her appointments by phone. However, over the course of Ms. P.'s treatment with Mr. Shuts, her attendance was very sporadic. Whenever Ms. P. missed an appointment, Mr. Shuts would call her. If Ms. P. did not answer, the office then tried to reschedule. To reschedule, two phone contacts were attempted and, if they could not reach her, they sent a letter. If she did not respond to the letter within 10 days, Catholic Charities closed her services file.

During her time at Catholic Charities, Ms. P.'s file was closed three times due to no contact. Ms. P. sought mental health services from March 2020 to December 2020. She reopened her file in May 2022, which was closed in March 2023. Then, Ms. P. reopened her file in January 2024. Ms. P. was still actively seeking outpatient therapy at the time of the termination hearing.

*Mike Magnotti: Domestic Violence Counselor at Catholic Charities*

Mike Magnotti, a licensed mental health counselor specializing in domestic violence assessments and counseling, conducted Ms. P.'s first assessment on January 14, 2021. Mr. Magnotti called Ms. P. and scheduled an appointment to do a domestic violence assessment within a few days after receiving the referral from Mr. Block. The morning of the appointment, Ms. P. called and cancelled but attended the rescheduled appointment. At the first appointment, Ms. P. told Mr. Magnotti that she had a learning disability and sometimes needed things explained to her. Mr. Magnotti read the test to

her, entered her answers, made sure she understood, and used small, plain language words. He communicated to Ms. P. primarily through e-mail. He did not treat Ms. P.'s case any differently than he would have with anyone else.

The test indicated that Ms. P. had an established and serious violence problem and severe drug use. Because Ms. P.'s drug risk was so severe, Mr. Magnotti believed he could not address her domestic violence issues until she remedied her substance abuse issues. Ms. P. also had severe risk issues in the control area, characterized by inflexibility, reacting negatively to people who did not agree with her, and having a hard time being told what to do. Mr. Magnotti recommended six months of treatment to address the potential domestic violence.

After six weeks, when Mr. Magnotti had not heard from Ms. P., he called her case worker who scheduled an appointment for her. Mr. Magnotti decided to engage Ms. P. in treatment even though she had not remedied her substance abuse issues. Ms. P. attended two appointments but canceled three between them. Her primary excuse for cancelling the appointments was that she was not feeling well. After the last short notice cancellation, Mr. Magnotti refused to schedule anymore for her.

*Dr. Catherine MacLennan: Psychologist*

Dr. MacLennan, a licensed psychologist, interviewed Ms. P. on June 9, 2021, after Ms. P. missed three appointments. When Dr. MacLennan conducts evaluations, she

determines whether the person suffers from a mental illness, whether the mental illness impacts a person's ability to safely and adequately parent children, conducts intellectual testing, and conducts academic achievement testing. If a person has a cognitive disability, she provides recommendations to DCYF on how to make sure the person understands what they are supposed to be doing.

Ms. P. arrived an hour late and admitted to using methamphetamine and marijuana that morning. Even though Dr. MacLennan believed she could not ethically conduct a complete evaluation because of Ms. P.'s drug use, she continued with the interview. During the three-hour interview, Ms. P. mentioned her mental disabilities and reported using methamphetamine every day. Because Ms. P. struggled with a severe methamphetamine addiction and had tried, but failed, to get clean and sober, Dr. MacLennan believed Ms. P. needed to go to inpatient treatment before conducting further psychological testing and evaluations. Because Ms. P. was under the influence of drugs, Dr. MacLennan did not test her intellect for ethical and accuracy reasons.

In Dr. MacLennan's report to DCYF, she indicated that DCYF should assume Ms. P. had intellectual disabilities and made some recommendations. DCYF needed to assume that Ms. P. was incapable of managing or planning transportation on her own without help, make all instructions very clear and simple in multiple modalities (verbal, written, with reminders), not overload her with requests, tasks, or services, and give her

10

frequent reminders about all appointments and expectations. Dr. MacLennan also noted that Ms. P.'s difficult personality could be partially explained by an intellectual disability. She recommended that DCYF notify Ms. P.'s service providers of her possible intellectual disability and make accommodations: offering individualized services, hands-on learning, minimal reading, minimal lectures, offer learning in multiple modalities, and involve modeling appropriate behavior. Dr. MacLennan also recommended that DCYF refer Ms. P. for a complete psychological evaluation including neuropsychological testing.

During the appointment, Dr. MacLennan helped Ms. P. enroll in a program that would help her get into an inpatient facility, would drive her to an inpatient facility, and would help her with the logistics of getting to services, like the evaluation that morning.

*New Path: Substance Use Disorder Treatment*

In March 2021, a few months before Ms. P.'s evaluation with Dr. MacLennan, Ms. P. started treatment at New Path. New Path is an intensive outpatient clinic offering substance use disorder services. Ms. P. was initially referred to New Path by Mr. Block, Ms. P.'s attorney, and Chelan County District Court Probation after being arrested for methamphetamine possession.

Marcy Treat, the associate director of New Path, completed Ms. P.'s initial assessment. During the assessment, Ms. P. indicated she had a learning disability.

The assessment recommended intensive inpatient treatment due to her severe methamphetamine use disorder. Ms. P. reported very recent and daily use of methamphetamine.

To accommodate Ms. P., Ms. Treat worked with her one on one. When necessary, New Path would read questions and have patients share their answers. However, Ms. P. did not have trouble with reading and writing, appeared to understand the curriculum, and asked appropriate follow-up questions. DCYF also later notified New Path of Dr. MacLennan's recommendations.

As with Ms. P.'s other services, her attendance was very sporadic. After her first assessment, Ms. P. did not come back until August. In August, Ms. P. attended one in-person appointment and scheduled to enter intensive inpatient treatment. However, she missed the rest of her August appointments, did not attend her bed date for intensive inpatient treatment, and attended only one appointment in September and one in October. This pattern continued. Over the course of her time at New Path, Ms. P. had as many as 10 bed dates but either cancelled or did not show for any of them. Ms. P.'s attendance at her weekly one-on-one visits was also poor; there was never a time where she attended weekly like she was supposed to. During the whole course of treatment, except for three weeks, Ms. P. regularly used methamphetamine.

Ms. P.'s chart was never closed, however. New Path has a reengagement process where they pursue the client. New Path called her, left messages when she did not answer, and sent letters, both to remind her of appointments and to ask her to reengage when she no-showed. When New Path realized that Ms. P. was not going to be able to comply, they started using harm reduction with her. Harm reduction is used for clients who are unable to stop using substances. New Path's goal for harm reduction is to meet the client where they are at, work to decrease use, and work to engage with the client, build a rapport, get them to trust you and get to the point where they believe you really want to help them. New Path also accommodated Ms. P. more than average by allowing her to participate by telephone sessions.

New Path tried everything it could to motivate and engage Ms. P. During weekly staff meetings, the providers talked about Ms. P. on a regular basis and discussed how to keep her engaged. They changed her workbooks and curriculum. Ms. P. was transferred to five different providers when she had a conflict with one, believing her provider was not there to help her. New Path encouraged Ms. P. to seek out self-help meetings. New Path also encouraged Ms. P. many times to move out of the low barrier apartment complex she was living at, meaning people actively used substances there. However, Ms. P. was unwilling to live in clean and sober housing, which was the only type of place she

could have afforded.  New Path also assisted Ms. P. with other barriers like getting her help to pay for housing and utility bills.

Ms. Treat believed Ms. P.'s willingness was her biggest barrier: lack of willingness to go to detox, lack of willingness to go to inpatient, lack of willingness to show up to appointments, lack of willingness to attend intensive outpatient, lack of willingness to move out of the toxic environment into clean and sober housing, and lack of willingness to attend her mental health appointments.

Ms. P. never completed intensive inpatient or intensive outpatient treatment even though she had a strong awareness of the need for sobriety and how important it was to regaining her children.

*Crystal Delancy: Social Worker from July 2021 to June 2024*

DCYF transferred Ms. P.'s case to Crystal Delancy on July 27, 2021.  Ms. Delancy had experience working with intellectually disabled parents and remained assigned to Ms. P. until the termination hearing.  When Ms. Delancy started working on the case, she reviewed Dr. MacLennan's report, which had been completed about one month prior.  She used it to guide her on how to best help Ms. P. with services and presumed Ms. P. had a potential intellectual disability.

Ms. Delancy discussed Dr. MacLennan's recommendations with New Path and Catholic Charities and provided them a copy.  These two services were the only ones Ms.

P. actively participated in and that DCYF had a release of information for. Neither service provider had made any accommodation at that point because they did not believe Ms. P. was struggling to understand anything but promised to make accommodations in the future if they felt Ms. P. needed them.

To build a rapport with Ms. P., Ms. Delancy had multiple conversations where she did not discuss services but merely listened to Ms. P. Ms. Delancy used motivation techniques designed to increase the motivation of some to participate in a service. Ms. Delancy also attempted to meet with Ms. P. in places that were comfortable to her, such as Ms. P.'s apartment.

Ms. Delancy attempted to engage Ms. P. in services several times a month using different modalities: going to her apartment, making phone calls, texting her, and sending her letters. She sent Ms. P. monthly service letters and letters that were specific to just one service, such as psych appointments, court dates, shared planning meetings, and her Catholic Charities appointments. Ms. Delancy used text messaging, phone calls, and in-person conversations to provide frequent reminders of those dates. Ms. Delancy also tried to utilize other people to motivate Ms. P., such as taking a second staff member from DCYF to meetings.

Ms. Delancy frequently asked Ms. P. to repeat back the information given and requested a verbal understanding. Ms. P. was able to recall pieces of previous

15

conversations and things she needed to complete. Even though the service letters had nine different things to complete, Ms. Delancy broke down Ms. P.'s services to focus on the most important one first so as not to overwhelm her.

Ms. Delancy believed the most important service for Ms. P. was substance use disorder treatment because Ms. P. could not fully engage meaningfully with any of the other services until she was sober. In every conversation they had, Ms. Delancy encouraged Ms. P. to go to treatment. Ms. Delancy discussed what kind of treatment modalities that inpatient treatment uses. Ms. Delancy encouraged Ms. P. to participate in UAs, even if they were positive, because it showed engagement and a willingness to participate. Ms. Delancy provided Ms. P. help with transportation to her services and to visitations.

Ms. P. frequently became angry, belligerent, and made threats while speaking to Ms. Delancy. However, Ms. Delancy knew it was partly from drug abuse and depression from her children being gone and continued to pursue Ms. P. to complete her services. Ms. Delancy never retaliated against Ms. P. for her vulgar, threatening behavior and, anytime Ms. P. apologized, Ms. Delancy let her know it was okay and understood this was a difficult time for her.

    *3. Termination Petitions*

    Ms. Delancy filed the termination petitions on February 4, 2022, because Ms. P. had not made any progress remedying her parental deficiencies, had not made progress in her services, and because the children needed permanency.

    Ms. Delancy explained to Ms. P. many times what could happen if she failed to remedy her parental deficiencies. Ms. Delancy spoke with Ms. P. about the consequences in person, in telephone calls, by letter, and text. They also discussed how her substance use was negatively impacting her ability to have her children returned to her. Ms. P. appeared to understand the consequences of not engaging in the services; however, she continued to deny the need for the services. Ms. Delancy would remind Ms. P. of the consequences of not participating in the service and believed Ms. P. understood the gravity of the situation because she would start crying and get upset.

    Ms. Delancy still attempted to provide referrals for another neuropsychological evaluation even though Ms. P. was not clean and sober. Ms. Delancy attempted with two doctors. The first appointment in November 2022, Ms. P. did not attend. When a volunteer driver arrived to pick up Ms. P. for the second appointment, she refused to get in the vehicle and stated she was not going to attend the appointment. At that point, the doctor refused to schedule another appointment because of her two no-shows. When Ms. P. was incarcerated in March 2023, Ms. Delancy called the doctor's office and pleaded

with them to complete the evaluation while Ms. P. was in jail. The doctor agreed; however, because Ms. P. was released early, the doctor was unable to complete the evaluation.

In January 2023, Ms. Delancy met with Ms. P. again and discussed her services, her knowledge of Ms. P.'s cognitive abilities, and stressed that the reason DCYF needed her to go to the psychological evaluation was to get recommendations on how best to provide her services. However, Ms. P. said she did not feel that her disability affected her ability to participate in her services or learn.

In February 2024, Ms. Delancy again tried to set up another neuropsychological evaluation. To ensure Ms. P.'s attendance, Ms. Delancy planned to personally drive her to the appointment and DCYF was going to pay for overnight accommodations to alleviate Ms. P.'s need to get up early for the evaluation. Ms. Delancy verbally confirmed the plan with Ms. P. several times. However, when Ms. Delancy arrived at Ms. P.'s apartment to pick her up, Ms. P. did not come to the door. When Ms. Delancy called her, Ms. P. answered her phone but hung up quickly stating she was in the shower.

Ms. Delancy waited outside Ms. P.'s door for over an hour, occasionally knocked, sent a text, or attempted to call her to see if she was ready to go. When Ms. P. came out of the apartment, she stated she could not go because she had two other appointments that day, one at New Path and one at Catholic Charities. Ms. Delancy offered to drive her to

New Path and wait and then called Catholic Charities and set up a Zoom meeting for Ms. P. instead. However, Ms. P. got angry and said that she was not going to the psychological evaluation. When Ms. Delancy explained that it was very important that Ms. P. go, Ms. P. got very belligerent. Ms. Delancy then called Ms. P.'s counselor at New Path, who Ms. Delancy knew had a good relationship with Ms. P., and asked the counselor to discuss the psychological evaluation appointment scheduled for Ms. P. that day and encourage her to attend. However, Ms. P. still refused. Ms. Delancy then scheduled another psychological evaluation with another doctor and offered to drive Ms. P.; however, Ms. P. refused to attend.

Because Ms. P.'s most important service was substance abuse treatment and because Ms. Delancy did not want to overwhelm Ms. P., Ms. Delancy did not refer Ms. P. to another domestic violence perpetrator assessment. However, in an effort to engage Ms. P. in any service she was willing to do, Ms. Delancy referred Ms. P. to another doctor for a domestic violence assessment in February 2024. Ms. P. attended; however, she left halfway through the appointment because she felt sick; the office was never able to get her in for another appointment.

Ms. P. had one period, during the four years of the case, in which she was sober for three weeks. In March 2023, after she was released from jail, she started getting Vivitrol injections and worked with New Path to maintain sobriety. During that time,

Ms. P. made progress in her services, had submitted two negative oral swabs, and had moved to a clean and sober house. However, Ms. P. lost her privilege to stay at the clean and sober house, so she moved back to her Catholic Charities apartment. She soon relapsed and her attendance issues began again.

*Visitations*

Supervised visits with the children were offered, both in person and virtually; however, Ms. P.'s attendance was sporadic. She was late, would leave early, or would not show up at all. Over the life of the case, Ms. P. attended about one-half of the scheduled visitations, both in person and via Zoom. Ms. P.'s last in-person visit with her children was on January 13, 2024. At first, M.A.P. was against the termination of Ms. P.'s parental rights; however, as time went on, M.A.P. aligned with DCYF's position because Ms. P. never followed through with her promises to take steps to correct her parental deficiencies. All but the first four days of M.M.B.-P.'s life had been spent with his placement family.

4. *Termination Hearing*

The termination hearing was originally scheduled for August 1, 2022; however, it was continued six times, four of which were to allow Ms. P. to attend drug treatment and psychological evaluations. On June 3, 2024, four and one-half years after the children

were placed in protective custody, the termination hearing was held. Ms. P. attended the hearing via Zoom on June 6 for a few minutes.

During the hearing, the above facts were testified to by Ms. P.'s service providers, Mr. Block, Ms. Delancy, and Dr. MacLennan. When Dr. MacLennan testified, she was asked about the sufficiency of the accommodations DCYF and Ms. P.'s service providers had provided to address her potential intellectual disabilities. Dr. MacLennan indicated the accommodations were consistent with her suggestions.

The trial court entered findings of fact and conclusions of law regarding M.A.P. and M.M.B.-P. and terminated Ms. P.'s parental rights. Specifically, the trial court found that:

> All services ordered pursuant to RCW 13.34.130, and RCW 13.34.136, and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided and were specifically tailored to meet [Ms. P.]'s potential cognitive deficiencies.
>     . . . .
> [Ms. P.] understood the service plan and . . . [DCYF] specifically tailored the services to meet [Ms. P.]'s potential cognitive disabilities/intellectual disabilities and [Ms. P.]'s failure to engage in services was due to her unwillingness to engage in services.

Clerks Papers (CP) (M.A.P.) (No. 40808-6-III) at 231-32; (M.M.B.-P.) (No. 40809-4-III) at 241-42.

The trial court concluded:

21

No. 40808-6-III (consolidated with No. 40809-4-III)
*Parental Rights to M.A.P.*; *Parental Rights to M.M.B.-P.*

> [DCYF] has offered or provided all services ordered under RCW 13.34.136
> and all necessary services, reasonable [sic] available and capable of
> correcting the parental deficiencies in the foreseeable future.  The Court
> concludes that [Ms. P.] was advised of, and understood, the services
> ordered and offered and how to access them.

CP (M.A.P.) (No. 40808-6-III) at 249; (M.M.B.-P.) (No. 40809-4-III) at 260.

Ms. P. timely appealed.

ANALYSIS

WHETHER DCYF TAILORED MS. P.'S SERVICES

*Standard of Review*

When reviewing a termination order, the appellate court assesses whether

substantial evidence supports the trial court's findings.  *In re Dependency of M.L.W.*,

4 Wn.3d 53, 71, 558 P.3d 919 (2024).  The findings are not disturbed unless "'clear,

cogent, and convincing evidence does not exist in the record.'"  *Id.* (internal quotation

marks omitted) (quoting *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d

75 (2016)).  "Clear, cogent and convincing evidence exists when the evidence shows the

ultimate fact at issue to be highly probable."  *In re Dependency of K.S.C.*, 137 Wn.2d

918, 925, 976 P.2d 113 (1999).  "Because of the highly fact-specific nature of termination

proceedings, deference to the trial court is 'particularly important.'"  *K.M.M.*, 186 Wn.2d

at 477 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

Appellate courts "defer to the trial court's determinations of witness credibility and the

22

persuasiveness of the evidence." *M.L.W.*, 4 Wn.3d at 71. Whether a termination order satisfies statutory requirements is a question of law, reviewed de novo. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011).

*Analysis*

Parents have a fundamental liberty and privacy interest in the care, custody, and companionship of their children. *K.M.M.*, 186 Wn.2d at 477. However, this right is not unqualified. *Id.* A child's basic rights of nurture, physical and mental health, and safety prevail over the rights of the parent. RCW 13.34.020.

A trial court may only terminate parental rights if two steps are satisfied. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents" and requires DCYF to prove, by clear, cogent, and convincing evidence, the six termination factors set forth in RCW 13.34.180(1). *Id.* If this burden is satisfied, DCYF must then prove that the parent is currently unfit and demonstrate that termination is in the best interests of the children by a preponderance of the evidence. *K.M.M.*, 186 Wn.2d at 479.

Ms. P. challenges the termination orders on two grounds. First, she alleges her rights cannot be terminated because DCYF failed to fulfill its statutory obligation to tailor all necessary services to her developmental disability. Second, she challenges the trial

court's finding that her unwillingness was the reason she was unsuccessful in remedying her parental deficiencies.[3] We address each argument in turn.

*Offering Necessary Services to the Developmentally Disabled*

By statute, DCYF was required to offer Ms. P. understandably necessary services capable of correcting her parental deficiencies. RCW 13.34.180(1)(d). A service is "necessary" if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

If "DCYF has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to ascertain whether the parent does in fact have a disability and, if so, how the disability could interfere with the parent's capacity to understand DCYF's offer of services." *In re Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 689, 486 P.3d 886 (2021). Next, "DCYF must tailor its offer of services to ensure that the offer is reasonably understandable to the parent." *Id.* at 699. The tailoring must be "informed by current professional guidelines and must accommodate the individual parent's needs rather than relying on broad-based or untested assumptions about the needs and abilities

---

[3] Ms. P. also assigns error to "Section 4.4 of the Order Terminating Parent-Child Relationship." Br. of Appellant at 3. Neither of the children's orders contain such a section. We assume it was a scrivener's error and Ms. P. intended to assign error to Section 3.4, which reads in the pertinent part, "[t]he parent-child relationship between the mother, [Ms. P.] and the child . . . should be terminated pursuant to RCW 13.34.190 and RCW 26.33." CP (M.A.P.) (No. 40808-6-III) at 251; (M.M.B.-P.) (No. 40809-4-III) at 262.

24

of people with intellectual disabilities." *Id.* To show that DCYF's offers were informed by professional guidelines, it is "essential" that DCYF present "evidence of what the applicable current professional guidelines would be." *Id.* at 702.

A trial court must apply a "consistent, objective standard that accounts for the individual circumstances of the case" when evaluating whether DCYF understandably offered services to the parent. *Id.* at 700. "To apply the correct standard, the trial court must place itself in the position of an objective observer who is aware of the nature and extent of the parent's intellectual disability, as well as current professional guidelines for communicating with people who have similar disabilities." *Id.* "The court must then determine whether DCYF's offer of services was reasonably understandable to the parent based on the totality of the circumstances." *Id.*

Here, the trial court's findings that Ms. P. understood the service plan and that DCYF specifically tailored the services to meet her potential cognitive disability are supported by substantial evidence. DCYF had reason to know Ms. P. had a possible intellectual disability at the end of January 2020. This was during the height of the COVID-19 pandemic, and Mr. Block testified he could not make service referrals right away. But Mr. Block took the first step DCYF is required to take and referred Ms. P. to Dr. MacLennan sometime between June 2020 and January 2021. Several attempts to evaluate Ms. P. were made before Dr. MacLennan met with her in June 2021. However,

because Ms. P. arrived under the influence of marijuana and methamphetamine, Dr. MacLennan was unable to properly assess Ms. P.'s intellectual levels. Dr. MacLennan nevertheless suggested that DCYF proceed as if Ms. P. was intellectually disabled and provided recommendations on how to accommodate her.

Substantial evidence shows that DCYF acted with a good faith belief that Ms. P. was intellectually disabled and acted on Dr. MacLennan's recommendations. Social worker Ms. Delancy, who took over Ms. P.'s case one month after Dr. MacLennan gave her report, had experience working with developmentally disabled parents. Ms. Delancy provided the report to New Path and Catholic Charities. Ms. Delancy addressed Ms. P.'s transportation needs to services and visitations. Ms. Delancy focused primarily on the most important service Ms. P. had to complete—substance abuse treatment. Ms. Delancy communicated with Ms. P. in person, by phone, by text, and by sending Ms. P. letters. Ms. Delancy also gave Ms. P. frequent reminders about her appointments. The letters sent to Ms. P. highlighted and bolded the most important services to complete. Ms. Delancy regularly asked Ms. P. whether she understood their conversations and asked Ms. P. to repeat information back. Ms. P. also asked appropriate follow-up questions. Ms. Delancy regularly addressed the consequences of not attending services.

Ms. Delancy was frequently threatened and yelled at by Ms. P. However, Ms. Delancy was never deterred and kept reaching out, kept providing support, and never retaliated.

While Dr. MacLennan advised that the most important service for Ms. P. to complete was substance abuse treatment, DCYF stayed aware of its obligation to get Ms. P. properly assessed to determine the extent of her intellectual disability. Many attempts were made to get Ms. P. evaluated. These attempts included voluntary transportation, addressed her difficulty getting up early in the morning, included many types of reminders, and pleading with doctors to give Ms. P. an evaluation even when it violated their policy of no-shows. Many times, Ms. P. just flatly refused to go. Ms. Delancy herself, when she went to pick up Ms. P. for one evaluation, attempted to overcome the many obstacles Ms. P. manufactured to prevent her from going. The termination hearing was continued six times, mostly to allow Ms. P. to attend a psychological evaluation. Over the course of four and one-half years, DCYF certainly made reasonable efforts to determine the extent of Ms. P.'s disability.

Nevertheless, Dr. MacLennan, as a professional in her field, gave professional advice on how to accommodate Ms. P. Substantial evidence shows that New Path followed these recommendations. Ms. P. first engaged with New Path before Dr. MacLennan's report. However, at the very beginning, Ms. P. told her provider she

27

suffered from an intellectual disability. In response, New Path modified its treatment and met with Ms. P. individually. New Path also offered to read its curriculum to Ms. P. and to write down her answers, but Ms. P. never had a problem with completing the workbook. Ms. P. expressed understanding, could repeat information, and asked appropriate follow-up questions. When Ms. P. refused to work with a provider due to some stated conflict, she was transferred to a new provider.

Ms. P.'s attendance was always poor. However, New Path never closed her chart; rather, it relentlessly pursued her. New Path called Ms. P., left messages when she did not answer, and sent letters, both to remind her of appointments and to ask Ms. P. to reengage when she no-showed. Ms. P. scheduled as many as 10 bed dates for intensive inpatient treatment; however, she either cancelled or failed to show for all of them. New Path tried every approach it could think of to engage and help Ms. P. such as changing her workbooks, changing her curriculum, working on case management, allowing her to attend appointments by phone, and trying to get her moved into more stable housing.

Ms. P. also engaged in mental health services at Catholic Charities with Mr. Shuts before Dr. MacLennan's report. At her first appointment, Ms. P. stated she had a learning disability. Despite this, and after being contacted by DCYF and informed of Dr. MacLennan's recommendations, Mr. Shuts did not find it necessary to provide accommodations. The appointments were individual and Ms. P. appeared to understand

the materials, expressed understanding, and asked appropriate follow-up questions. Mr. Shuts also allowed Ms. P. to attend her appointments by phone. Over the course of her treatment with Mr. Shuts, Ms. P.'s attendance was sporadic. Whenever Ms. P. missed an appointment, Mr. Shuts would call her. If Ms. P. did not answer, the office then tried to reschedule. To reschedule, two phone contacts were attempted and, if they could not reach her, they sent a letter. Ms. P. was still actively seeking outpatient therapy at the time of the termination hearing.

Mr. Magnotti met with Ms. P. a few times in early 2021 for domestic violence counseling. At the first appointment, Ms. P. told Mr. Magnotti she had a learning disability and sometimes needed things explained to her. Mr. Magnotti read the personality test to her, used small, plain language words, entered her answers, and made sure she understood. The test indicated that Ms. P. had a severe risk for continuing drug use and because her risk was so severe, Mr. Magnotti felt he could not adequately address her domestic violence issues until she dealt with her substance abuse issues. Nevertheless, after Mr. Magnotti did not hear from Ms. P. after their first appointment, he reached out to Mr. Block to schedule an appointment with her. However, after only two visits and multiple failures to show and last-minute cancellations, Mr. Magnotti refused to schedule any more appointments with her.

This was all done before Dr. MacLennan's report. After her report, while domestic violence counseling was still a service Ms. P. needed to complete, Ms. Delancy focused primarily on substance abuse engagement so as not to overwhelm Ms. P. However, in February 2024, to try to engage her in any service she was willing to do, Ms. Delancy referred Ms. P. to another doctor for a domestic violence assessment. Ms. P. attended; however, she left halfway through because she felt sick and the office was never able to get her in for another appointment.

Ms. P. argues that *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 917, 385 P.3d 268 (2016), is applicable to her case. In *I.M.-M.*, a doctor determined the mother might be developmentally disabled. *Id.* at 919. Just as here, the doctor was unable to finish the applicable testing; however, he made several recommendations and gave a report to DCYF. This report was only shared with one of the mother's service providers, a mental health therapist. *Id.* Even though the mother's primary parental deficiency was substance abuse, the report was never shared with her chemical dependency providers. *Id.* Furthermore, the mother seemed to have no awareness of her intellectual deficiency and demonstrated a willingness to engage in services for substantial periods of time. *Id.* at 918, 925. DCYF also failed to investigate the apparent likelihood of the mother's intellectual disability when the doctor noted his examination was incomplete. *Id.* at 924.

Even though the trial court found that she was provided appropriate accommodations and terminated her parental rights, we disagreed and reversed the trial court. *Id.* at 926.

Here, the facts of *I.M.-M.* do not help Ms. P. DCYF had reason to know Ms. P. could be intellectually disabled at the very start of the dependencies. However, because the report was made for employment purposes, a parental-focused psychological evaluation was ordered. Multiple attempts were made to evaluate Ms. P. before the appointment with Dr. MacLennan was completed. Unlike in *I.M.-M.*, however, the report, even though incomplete, was shared with all of Ms. P.'s active service providers. Additionally, New Path, Ms. P.'s most important service, followed Dr. MacLennan's recommendations carefully. DCYF also continued to pursue a completed psychological evaluation to determine the extent of Ms. P.'s intellectual disability.

Ms. P. also argues that Mr. Block's apparent unawareness of her possible intellectual disability precludes a finding that services were understandably offered. She asserts that if DCYF had involved developmental disability professionals early in the dependency process, there is a likelihood that her parental deficiencies could have been remedied in the near future.

The trial court weighed the evidence it had before it and decided, under the totality of the circumstances, that Ms. P.'s services were tailored to her disability. While it is true that Mr. Block never consulted with a developmentally disabled professional or tailored

the services he offered through DCYF, he attempted to get Ms. P. psychologically evaluated several times. If Ms. P.'s parental rights were terminated closely after Dr. MacLennan's report, her argument might be more compelling. However, another three years passed and several continuances were granted while DCYF and New Path tried to engage Ms. P. in services using Dr. MacLennan's recommendations. Under the totality of the circumstances, DCYF understandably offered necessary services to Ms. P.

DCYF repeatedly attempted to ascertain whether Ms. P. did in fact have a disability and, if so, how the disability could interfere with her capacity to understand DCYF's offer of services. However, because of Ms. P.'s actions, DCYF was unsuccessful. Even then, it proceeded on good faith and followed Dr. MacLennan's recommendations. Substantial evidence exists that Ms. P. understood the service plan and that DCYF specifically tailored the services to meet her potential cognitive disability. Therefore, DCYF understandably offered Ms. P. necessary and available services, and the trial court's findings and corresponding conclusions of law were not in error.

*Unwillingness and Futility of Services*

Ms. P. also argues the trial court erred when it found that her failure to engage in services was due to her unwillingness. Ms. P. also implicitly challenges the trial court's findings that based on her unwillingness to substantially engage over the course of the

dependencies, any services offered would be futile.[4] We disagree with her argument and her implicit challenge.

The trial court can make a finding that DCYF has offered all reasonable services if the record establishes that the offer of services would have been futile. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008). The offer of services would be futile "where a parent is unwilling . . . to participate in a reasonably available service that has been offered or provided." *K.M.M.*, 186 Wn.2d at 483.

For three years, DCYF offered Ms. P. services in the manner recommended by Dr. MacLennan by providing frequent reminders across modalities and offering transportation services. Her substance abuse treatment was tailored to her. She was consistently reminded of the importance of the services and the consequences if she did not comply. However, Ms. P. repeatedly demonstrated an unwillingness to participate in services. She failed to show or cancelled many of her service appointments. She cancelled many of her bed dates and did not show up to the others. Ms. P. refused to attend several neuropsychological evaluations when transportation was provided. Several service providers testified that Ms. P.'s propensity to cancel or failure to show was her biggest barrier to success. Ms. P. also only attended about one-half of her visits with her children and frequently arrived late.

---

[4] *See* CP (M.A.P.) (No. 40808-6-III) at 232; (M.M.B.-P.) (No. 40809-4-III) at 242.

When Ms. P. was sober for a short period of time after being released from jail, she was able to engage consistently in treatment and services for three weeks. Her ability to engage for that period demonstrates she could comply with her services.

Ms. P. argues that *In re Termination of Parental Rights to E.J.O.*, No. 39266-0-III (Wash. Ct. App. Nov. 30, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/392660_unp.pdf, is distinguishable and therefore helps her case. As an unpublished case, *E.J.O.* is not binding and has no precedential value. However, we discuss it to address Ms. P.'s argument. In *E.J.O.*, the court upheld orders terminating parental rights when the record demonstrated that DCYF adequately assessed the mother's cognitive needs and her failure to engage in services was not attributable to any lack of cognitive disabilities. *E.J.O.*, slip op. at 1, 10.

The mother in *E.J.O.* received a full psychological evaluation early in the dependency process that led the doctor to recommend accommodations in instructing her about her services due to a cognitive disability. *E.J.O.*, slip op. at 3. However, it was the mother's refusal to participate in an essential service that compelled the trial court to terminate her parental rights. *E.J.O.*, slip op. at 10.

Ms. P. again seems to argue that the timing of her evaluation is insufficient. However, there is evidence that Mr. Block attempted to get Ms. P. evaluated much earlier

in the process.  Here, as in *E.J.O.*, it was Ms. P.'s refusal to participate in an essential service that compelled the trial court to terminate her parental rights.

Substantial evidence supports the trial court's findings that Ms. P.'s failure to engage in services was due to her unwillingness and, based on her unwillingness, even if she had obtained a neuropsychological evaluation and received confirmation of her intellectual disability and further recommendations, it would have been futile.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____          _____
Staab, J.                                                    Cooney, J.