IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of Parental Rights to | ) | No. 41378-1-III |
| | ) | |
| | ) | |
| | ) | |
| J.E.M.R. [†] | ) | UNPUBLISHED OPINION |

HILL, J. — J.R. brings this appeal to challenge the termination of his parental rights to his daughter, J.E.M.R. J.R. disputes the trial court's findings that the Washington Department of Children, Youth & Families (Department) satisfied its obligation under RCW 13.34.180(1)(d) to provide necessary services and that termination of J.R.'s parental rights was in J.E.M.R.'s best interests. We affirm.

BACKGROUND

J.R. and T.J. bore a child together, J.E.M.R., in January 2017. In 2018, the Department initiated J.E.M.R.'s first dependency due to concerns including the parents'

---

[†] To protect the privacy interests of J.E.M.R., we use their initials throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective Sept. 1, 2018) http://www.courts.wa.gov/appellate_trial_courts.

substance use and domestic violence issues in their relationship. The Department

removed J.E.M.R. from her parents' care and placed her with relative M.A. The court

terminated mother, T.J.'s, parental rights in October 2019 and ordered that father, J.R.,

complete a variety of services. In August 2020, after J.R. completed these court-ordered

services, the Department returned J.E.M.R. to him. The first dependency closed in 2021.

In June 2022, J.R. called the police to report that M.A. kidnapped J.E.M.R. When

Yakima Police Officer Jared Wilske contacted J.R. in the Yakima Pediatrics parking lot,

J.R. explained that he wanted a sexual assault examination for J.E.M.R., who he had

dropped off at M.A.'s residence. Officer Wilske observed that J.R. was acting erratically

and was paranoid.

Officer Wilske contacted M.A., who made several concerning disclosures. She

told Officer Wilske that domestic violence existed in J.R.'s home, that J.E.M.R. told her

J.R. punched T.J. in the ribs and held a knife to T.J.'s throat, and that J.E.M.R. was dirty,

unkept, and malnourished when she arrived at M.A.'s home. Based on this information,

Wilske placed J.E.M.R. in protective custody. The Department initiated a second

dependency action on June 30, and J.E.M.R. was again removed from J.R.'s care.

In December 2022, J.R. stipulated to the entry of an agreed order of dependency.

The court found J.E.M.R. dependent and ordered that she once again be placed with M.A.

The order identified J.R.'s parental deficiencies, including substance use, parenting,

mental health, and domestic violence. To target these deficiencies, the court ordered J.R. to undergo a substance use disorder assessment, parenting education, a domestic violence assessment, a mental health assessment, and services through the jail while J.R. was incarcerated. J.R. completed all court-ordered services in the second dependency.

J.E.M.R. was diagnosed with posttraumatic stress disorder (PTSD). She scored a 10 on the "Adverse Childhood Experiences" (ACEs) scale, which is the highest level. Rep. of Proc. at 333. J.E.M.R. attempted to work through this trauma as J.R. participated in the court-ordered Triple P program, which consisted of 10 sessions targeted toward teaching positive parenting practices. Typically, a provider from the Department attends these sessions with the parent. Provider Paula Soria attended J.R.'s parenting sessions. J.E.M.R. attended three or four of those sessions with J.R. J.R. completed his Triple P parenting course in February 2023. In May 2023, social worker Briana Rangel sent a family counseling referral to Soria. At the time the referral was sent, J.E.M.R. had attended, and was continuing, counseling sessions at Catholic Family Charities. Rangel sent the referral to Soria instead of J.E.M.R.'s counselor at Catholic Family Charities because the counselor, Sonya Osborn, declined to conduct family counseling sessions with J.E.M.R. and J.R. because she felt it was not appropriate for J.R. to attend J.E.M.R.'s sessions and believed counseling at Catholic Family Charities was a safe space for J.E.M.R.

After receiving the referral for family counseling, Soria arranged to occasionally provide the service for J.R. and J.E.M.R. during visitation. She attended at least one visit in July 2023. During a visit between J.R. and J.E.M.R. on July 14, at which Soria was not in attendance, J.R. relayed to the visit supervisor that the reason J.E.M.R. was again removed from his care was because M.A. kidnapped J.E.M.R. The comment upset J.E.M.R. After this visit, J.E.M.R. consistently refused any further visits with her father. We refer to this as the "July 2023 incident" throughout this opinion.

Once J.E.M.R. completed her counseling sessions at Catholic Family Charities in October 2023, the Department referred her to individual counseling at Comprehensive Counseling. J.E.M.R. began counseling sessions with Annalisa Hardy in January 2024. At J.R.'s request, Rangel asked Hardy whether J.R. could attend some of J.E.M.R.'s therapy sessions. Hardy declined because that was not something J.E.M.R. wanted and because Hardy believed family counseling would not be in J.E.M.R.'s best interests. Any time Rangel attended J.E.M.R.'s Comprehensive Counseling sessions, she would ask J.E.M.R. if she wished to see her father in person, speak with him over the telephone, over video, or write him a letter. J.E.M.R. occasionally opted to write a letter. In one letter, J.E.M.R. indicated she was mad at J.R. and hated him for hurting T.J. On the back of that letter, J.E.M.R. inquired about J.R.'s favorite color of pink. Rangel delivered that letter to J.R., and J.R. wrote back. Rangel sought to deliver J.R.'s response letter to

4

J.E.M.R., but Hardy believed it would not be appropriate to give the letter to J.E.M.R. because J.R. did not take accountability for his earlier conduct in the letter and instead just asked to have a visit with J.E.M.R. The counselor felt like sharing the letter with J.E.M.R. would cause her to feel guilty and regress all the progress she made.

The Department filed a petition to terminate the parent-child relationship between J.R. and J.E.M.R. on February 6, 2024.[1] Trial on the Department's termination petition commenced in late April 2025. Many individuals testified at trial, including J.R., Rangel, J.E.M.R., Officer Wilske, and Soria. Rangle, Officer Wilske, and Soria testified consistently with the facts outlined above.

J.E.M.R. testified that living with her father was "scary" due to the domestic violence she witnessed. RP at 222-24. She described J.R. "hitting my mom" and "screaming at [T.J.]" and that J.E.M.R. told J.R. to stop, "and he wouldn't stop." RP at 222. This happened on more than one occasion. On one such occasion, J.E.M.R. punched J.R. to try and get him to stop hitting T.J. In response, J.R. threw J.E.M.R. on a bed.

J.E.M.R. told the court that she may want to see her father one day when she is older, but she had no desire to see or speak with him at the time of trial. J.E.M.R. offered

---

[1] J.R. filed a motion for visitation on July 3, 2024. A hearing on the motion took place on July 23. On August 16, the commissioner entered an order denying the motion.

that she wished to be adopted by M.A. and considers M.A. to be her mom.  When asked

whether she felt safe during visits with her father, J.E.M.R. replied, "Yes and no."  Rep.

of Proc. at 226.  J.E.M.R. replied, "[Y]es" if she was with another person because she

knew that if J.R. tried to do something to her, there would be someone else in the room to

protect her.  RP at 226.  J.E.M.R. replied, "[N]o" because she had seen J.R. hurt T.J. and

did not want him to do the same to her.  RP at 226-27.  J.E.M.R. testified that, if she had

an opportunity after trial to participate in counseling with her father, she "would be so

scared."  RP at 232.

In its oral ruling, the trial court addressed the six requirements outlined in

RCW 13.34.180(1), which the Department must satisfy when seeking to terminate a

parent-child relationship.  The court's ruling as to the fourth requirement, found in

RCW 13.34.180(1)(d), bears relevance to the issues raised on appeal:

> Family therapy, however, was never ordered by the Court, as a necessary service even though the Department did, because it's not just court ordered, it's a necessary service reasonably available.  The Department did research that as an opportunity to address the lack of bond and attachments.
>
> Subsequent to the refusal, Father asked the Court for family therapy to be ordered as a necessary service, but the Commissioner . . . denied that request.  And it was never ordered, although again, it was clearly discussed by the Department.
>
> . . . .
>
> I know the State has at times argued that family therapy was a service that was provided.  I can't make that finding that family therapy

6

was a service that was ever provided. I think it was clear that it was considered investigated, initiated, but never provided.

So, what the Court needs to do is decide whether or not there—is family therapy is a necessary service. And again, a necessary service is reasonably available and capable of correcting the parental deficiencies within the foreseeable future.

And in this case, and based upon the facts that have been presented to this court, I can't find family therapy is a necessary service. I can't find that it's capable of correcting the parental deficiencies really within the foreseeable future. And again, when we're looking at the foreseeable future, we're looking at it from the perspective of [J.E.M.R.].

. . . .

So, I can't find that family therapy or really any other necessary services reasonably available, capable of correcting the parental deficiencies, which is the attachment and bond between [J.R.] and [J.E.M.R.]. That there's anything else that can be offered or provided that would render a change in the foreseeable future.

. . . .

There's also some conversation about being a futile service. And the Court does agree that family therapy or any other options that would be available, which no one provided in the course I'm aware of any, would be futile as well. And not futile from the sense that it—it's really anything that [J.R.] has done.

. . . .

. . . And even though [J.R.] has done everything that's been asked of him, it—it hasn't been enough, and it's just not enough to repair the relationship.

. . . .

Also with the family therapy, it's clear to this court that [J.E.M.R.] needs to resolve her own counseling and PTSD before family therapy's ever an option, that any sort of forced family therapy or in K.M.M, you know, we sort of had these informal visitations or passthroughs. But

anything of that nature would just further exacerbate the PTSD and cause further trauma on JEMR. So, there just really isn't any option.

So I do find that services ordered under RCW 13.34.136 have been expressed and understandably offered. And that all necessary services reasonably available and capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered and provided.

RP at 613-22.

The court thereafter found that the Department proved by a preponderance of the evidence that termination of J.R.'s parental rights was in J.E.M.R.'s best interests and granted the termination petition. An order filed after the trial reflects the court's oral findings, conclusion, and ultimate decision.

J.R. appeals.

ANALYSIS

*Provision of Necessary Services*

J.R. disputes the trial court's findings that the Department satisfied its burden under RCW 13.34.180(1)(d) to offer or provide all necessary services, reasonably available, capable of repairing the attachment and bond between himself and J.E.M.R. He argues that the Department did not contemplate or offer alternative services that could have repaired the relationship between J.R. and J.E.M.R. after determining family therapy and conventional visitation could not be facilitated due to J.E.M.R.'s refusal to

8

participate in visitation. He also disputes the trial court's finding that any such services would have been futile. We conclude substantial evidence in the record supports the trial court's findings.

"Parents possess a fundamental liberty interest in the custody and care of their children." *In the Matter of the Dependency of A.N.C.*, 24 Wn. App. 2d 408, 414, 520 P.3d 500 (2022). Nevertheless, the State may follow a two-step process to terminate the parent-child relationship. *A.N.C.*, 24 Wn. App. 2d at 414-15; *In the Matter of the Parental Rights to A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 3.34.180(1); RCW 13.34.190. First, the State must establish, with clear, cogent, and convincing evidence, that it satisfied the six requirements set forth in RCW 13.34.180(1). *A.N.C.*, 24 Wn. App. 2d at 414-15. Second, the State must prove, by a preponderance of the evidence, that termination of the parent-child relationship is in the child's best interests. *Id.*; RCW 13.34.190(1)(b).

In reviewing a trial court's termination order, this court analyzes whether substantial evidence supports the findings outlined therein. *In the Matter of the Parental Rights to M.L.W.*, 4 Wn.3d 53, 71, 558 P.3d 919 (2024). However, we treat unchallenged facts as verities. *In the Matter of the Dependency of C.B.*, 79 Wn. App. 686, 691, 904 P.2d 1171 (1995). We review de novo whether the findings of fact in turn support the conclusions of law. *In the Matter of the Dependency of Schermer*, 161 Wn.2d 927, 939-

40, 169 P.3d 452 (2007). We will not disturb the determinations made by the trial court as to witness credibility and the persuasiveness of the evidence. *M.L.W.*, 4 Wn.3d at 71.

RCW 13.34.180 lists six requirements that the Department must satisfy to obtain an order terminating a parent-child relationship. J.R. challenges only the fourth requirement:

> (1) A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8), and shall allege all of the following unless subsection (3) or (4) of this section applies:
>
> . . . .
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180. A "necessary service," as the term is used in the statute, is a service that "is needed to address a condition that precludes reunification of the parent and child." *In the Matter of the Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014). Our state's Supreme Court has included "counseling, mental health treatment, and educational programs" as such potential services. *In the Matter of the Parental Rights to D.H.*, 195 Wn.2d 710, 719, 464 P.3d 215 (2020).

10

Because parents face different challenges and require different levels of assistance, the necessary services must be tailored to the needs of the parents. *A.N.C.*, 24 Wn. App. 2d at 416. However, "[a] service that is not reasonably available to a parent is not a necessary service." *Id.* "Even in instances where the Department inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future." *In the Matter of the Parental Rights to K.M.M.*, 186 Wn.2d 466, 486, 379 P.3d 75 (2016). Similarly, under the futility doctrine, "[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." *In the Matter of the Parental Rights to M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

J.R. challenges several of the trial court's findings of fact but references only some of them in his argument. These include:

> 2.8 The services offered under RCW 13.34.130 have been expressly and understandably offered or provided, and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided to the father, [J.R.], as follows:
>
> . . . .
>
> 2.8.7 Although family therapy was not a necessary service pursuant to RCW 13.34.180(1)(d), and the Department was never ordered to provide family therapy in this dependency, the Department considered, investigated, and initiated family therapy during [J.E.M.R.]'s dependency.

. . . .

2.8.7.2 While family therapy was not provided by the Department, family therapy and any other necessary, reasonably available services capable of correcting the parental deficiency of the broken attachment and bond between [J.R.] and [J.E.M.R.] within [J.E.M.R.]'s foreseeable future, which no party could specifically suggest, would have been futile at this time under these specific factual circumstances.

. . . .

2.14 The Court cannot find that there is a reasonable and available service capable of correcting the broken bond between [J.R.] and [J.E.M.R.] within the foreseeable future. From [J.E.M.R.]'s perspective as an 8-year-old child, she has spent three years of her life with [J.R.] and five years with her prospective adoptive mother. This is significant because of [J.E.M.R.]'s age, as she did not spend formative years with her parents.

. . . .

(b) The Court had concerns about whether or not the Department encouraged [J.E.M.R.] to participate in visits or [other] therapy with [J.R.], but the Court finds that [J.E.M.R.] is smart and shows concern for losing the only family she knows. While an eight-year-old should not have to make such a weighty decision, it does appear to be well though-out by the child. By continuing the dependency, [J.E.M.R.] will be re-victimized or traumatized, which is of particular concern given her PTSD diagnosis and ACES score.

Clerk's Papers at 201-04.

J.R.'s primary contention is that the Department failed to adequately explore services for rehabilitating his relationship with J.E.M.R. He relies on *K.M.M.*, where the Department removed daughter K.M.M. from the custody of father J.M. and mother D.C. due to suspicions of physical abuse and substance abuse. 186 Wn.2d 466. During the dependency, K.M.M. engaged in regular therapy and expressed to her therapist her wish

to be adopted. *Id.* at 474. K.M.M. became reluctant to participate in visitation with her parents, started ending visitation early, and ultimately refused to participate in the visits all together. *Id.* Because K.M.M. was not engaging in visitation, the court appointed a family therapist to determine whether visitation was appropriate for the family and, if so, how it should occur. *Id.* at 474-75. The family therapist recommended a "natural contact" plan, which would be implemented when the Department returned K.M.M.'s siblings to their mother D.C. *Id.* The plan entailed facilitating "passive contact between K.M.M. and her parents that was incidental to her interactions with her siblings." *Id.* at 475. The court suspended visitation when the passive contact plan failed. *Id.*

The Department filed two termination petitions seeking to terminate the parents' parental rights. *Id.* at 476. At the conclusion of the second termination trial, the court terminated J.M.'s parental rights to K.M.M. *Id.* "The court found that all court-identified parental deficiencies had been corrected and all necessary services had been provided." *Id.* The court concluded that J.M. was unable to parent K.M.M. because an attachment bond between the two no longer existed. *Id.* J.M. appealed, and the case eventually reached our state Supreme Court.

J.M. argued that his parental rights could not be terminated because the Department failed to offer or provide all necessary services, pursuant to RCW 13.34.180(1)(d), as it never provided him with family therapy and attachment

and bonding services. *Id.* at 479. The court affirmed the termination order and the trial court's finding that the Department complied with the requirements of RCW 13.34.180(1)(d) for three reasons. First, family therapy was not a necessary service in the proceeding as it was never a service that could have been provided to the father given that it was contingent on reunification between himself and K.M.M., and the father's failure to improve his mental health issues prevented the reunification. *Id.* at 482-83. Second, the record established the relationship between J.M. and K.M.M. was far beyond repair, rendering any further attempts to reunify the two detrimental and harmful to K.M.M. *Id.* at 484. Third, because K.M.M. did not want to reconcile with her parents, and the record lacked evidence that the parent-child relationship between the father and daughter could be repaired, providing additional services would not have cured J.M.'s parental shortcomings within the foreseeable future. *Id.* at 487.

J.R. uses *K.M.M.* as a benchmark and argues that, because not all of the factors in that case are present here, this court should reverse. He points to five differences. First, unlike in *K.M.M.*, where the Department offered the alternative "natural contact" plan for repairing the relationship between the father and daughter when the daughter declined visitation, the Department did not offer a similar passive service when J.E.M.R. declined visitation. Second, there are neither mental health concerns nor any other ongoing parental deficiencies exhibited by J.R., whereas the father in *K.M.M.* displayed mental

14

health issues and possessed parental deficiencies. Third, the court in *K.M.M.* relied on testimony that the daughter was old enough to have developed an identity separate from that of her parents, and the court in this case observed J.E.M.R. was not at an age to make similar determinations. Fourth, K.M.M. was terrified of her father's presence, whereas J.E.M.R. did not want to participate in visits because she was upset with the comment he made about M.A. Fifth, the father in *K.M.M.* lacked awareness of the trauma he inflicted on his daughter, whereas J.R. showed remorse for the harm he caused to J.E.M.R.

While we agree there are some distinctions between *K.M.M.* and the present case, we do not find these distinctions significant. After the July 2023 incident, J.E.M.R. consistently refused to participate in any further visitation or interact with her father in person. J.E.M.R.'s decision was not just because of the July 2023 incident, but because she was afraid of her father. This fear was justified based on her exposure to J.R.'s acts of domestic violence which, at least in part, caused her to have a PTSD diagnosis with an ACES score of 10. Like the *K.M.M.* case, J.E.M.R. had not seen her father in person for a significant period and expressed a desire to be adopted by M.A., with whom she had lived for some time. And, after listening to J.E.M.R's testimony, the court specifically found M.A. was able to offer an informed opinion on her placement.

J.R. argues that the Department was nonetheless required to offer additional services that would have assisted in repairing his relationship with his daughter.

However, substantial evidence supports the court's finding that family therapy was the

only service that could have been effective in repairing the broken bond and attachment

between J.R. and J.E.M.R.[2] Since J.E.M.R. refused to engage in that service, any other

services that the Department could have offered, including "passive services" suggested

by J.R., would have been futile. The futility doctrine applies when the record establishes

that the offer of services would have proven futile. *M.R.H.*, 145 Wn. App. at 25. Because

the record establishes that any further services that could have been offered by the

Department would have proven futile, the court was permitted to find that the Department

offered all reasonable services under RCW 13.34.180(1)(d).

We therefore uphold the trial court's findings and conclusions on this issue.

*Child's Best Interests*

J.R. also disputes the trial court's finding that termination of his parental rights

was in J.E.M.R.'s best interests. J.R. argues the finding is not supported by substantial

evidence because the notion that J.E.M.R. spent too much time living under the

uncertainty of dependency and needs a permanent resolution in the matter ignores the

---

[2] J.R. argues the Department's decision to undertake a "quality practice consult" rather than a "clinical case consultation," which should include "Rand clinical recommendations" was error. RP at 341-42. However, J.R. fails to explain the difference between these consultations or how they might have improved the situation.

importance of the family bond and the dangers that flow from termination. He does not elaborate on this argument, nor does he cite any portion of the record to establish a lack of evidence supporting his position.

Once the court finds the Department established with clear, cogent, and convincing evidence that the State satisfied the requirements set forth in RCW 13.34.180(1), the court must then find that the Department proved, by a preponderance of the evidence, that termination of the parent-child relationship is in the best interests of the child in order to terminate the parents' rights to that child. RCW 13.34.190; *A.N.C.*, 24 Wn. App. 2d at 414-15.

The record before us shows that (1) J.E.M.R. is afraid of her father and suffers from the trauma she experienced in his presence; (2) neither of J.E.M.R.'s counselors believed that family therapy would have assisted in repairing the relationship between J.E.M.R. and J.R., with one counselor believing that family therapy with the father and daughter would cause J.E.M.R. to regress in all the progress she had made; (3) J.E.M.R. did not see or speak to J.R. for almost two years preceding the start of trial; (4) J.E.M.R. has formed a strong bond with M.A. and favors the stability M.A. offers, and (5) J.E.M.R. wishes to be adopted by M.A. On this record, we affirm the trial court's conclusion that termination was in J.E.M.R.'s best interests.

No. 41378-1-III
*In re Parental Rights to J.E.M.R.*

CONCLUSION

Although J.R. completed all of his court-ordered services in the second dependency, substantial evidence supports the court's findings that the bond between J.E.M.R. and her father was broken and that there were no services that could repair it. We affirm the trial court's decision finding that termination of J.R.'s parental rights was in J.E.M.R.'s best interests.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Hill, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Murphy, J.

18